[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-14145
_____

D.C. Docket No. 3:17-cr-00110-MCR-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOHN WILLIAM HALL,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(July 21, 2020)

Before ROSENBAUM and ED CARNES, Circuit Judges, and VINSON,[*] District Judge.

ED CARNES, Circuit Judge:

_____

[*] Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida, sitting by designation.

A decade ago this Court, sitting en banc, remarked: "The steady stream of criminal cases flowing through this Court brings us many examples of man's inhumanity to man, and we see a depressingly large number of crimes against children." United States v. Irey, 612 F.3d 1160, 1166 (11th Cir. 2010) (en banc). This is another one of those cases. The defendant was convicted for sexually abusing little girls, plea-bargained to a sentence of less than a year in jail for what he did to them, and registered as a sex offender when he was released. Then he sexually abused more young girls, leading to new charges and a new conviction and a new sentence.

The pattern, unfortunately, is not that unusual. What is more unusual is that the record in this case contains descriptions and evidence of the devastating and long-lasting effects crimes like these can inflict on the children sexual predators abuse and on their family members.

## I.  BACKGROUND

In 2017, John Hall, who was at that time a registered sex offender because of crimes he had committed decades earlier, was found in possession of more than 100 images of child pornography. He pleaded guilty to a single count of receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2) and (b)(1). His advisory guidelines term of imprisonment was 180 months, but the district court varied upwards and sentenced him to 480 months in prison. Hall appeals,

2

challenging his sentence on the grounds that the district court improperly relied on hearsay evidence, did not give the notice required for departing upward, and imposed a substantively unreasonable sentence.

Although Hall's conviction in this case stems from his receipt of child pornography in 2017, that is not his only sex offense involving child victims. Not nearly. And much of Hall's attack on his sentence relates to the district court's consideration of his earlier crimes, so we will start with them.

## A.  Hall's Earlier Sex Crimes Against Children

The evidence admitted at the sentence hearing in this case showed that in or around 1992 and 1993 Hall had sexually abused three young girls: K., who is Hall's oldest biological daughter; and A. and L., who are daughters of Hall's friend Wendy.[1]  Wendy trusted Hall to babysit her two young daughters regularly while she worked. K. and A. were both seven or eight years old at the time. L. was about three years old. Hall was 34.

Wendy first learned in 1993 that Hall had sexually abused her daughters. That year L., her three-year-old daughter, told Wendy that Hall had bitten her in the vaginal area. L. also told Wendy that Hall did the same thing to A., Wendy's older daughter, and to K., Hall's daughter. Wendy asked A. about what had happened. A. cried but would not talk about it.

---

[1] We refer to Hall's child victims by letters instead of by their names for obvious reasons.

Wendy, who had always been "real particular about who watche[d] [her] kids," and had "been scared of leaving [her] girls with people" she didn't know or trust, pleaded with A. to tell her if Hall was molesting her. She said to A., "[P]lease, if he's messing with you . . . I need to know. You've got to tell me." Still, A. "would not say a word. Just big old tears. And you could tell, it was like [A.] was in shock." So Wendy told A. to just shake her head yes or no to Wendy's questions. When Wendy asked A., "[D]id he [meaning Hall] touch you?" A. "shook [her] head yes." A. shook her head "no" when Wendy asked if Hall had "done anything else" or "had any kind of sex or anything like that." At that time A. wouldn't say anything more or respond to any more of Wendy's questions. (When she finally received treatment years later, A. disclosed to her counselor and then to Wendy that Hall's abuse of her had been much more extensive than touching.)

Wendy then confronted Hall, who admitted to touching A.'s vaginal area, "[s]wore he didn't touch [L.]," and "cried, begged[,] and pleaded with" Wendy not to file a police report. To prevent her from doing that, Hall promised he would get counseling. Wendy had known Hall "all of her life, basically," and she "didn't know what to do." She "thought the man just made a mistake," so she decided not to report him to the police. But she kept her children away from Hall after that and would later say that if she had "known detail," she would have done more.

4

In December 2001, the Escambia County Sheriff's Office learned from another source that A. had recently divulged that around 1992 and 1993, Hall had sexually molested A. and K. The Sheriff's Office interviewed A. She told the officers that when she was about seven years old, Hall had molested her and his daughter K. for a period of several years. Among other things, he would touch their breasts, and he made them touch his penis and put it in their mouth, and he inserted his fingers into their vaginas, and he made them remove their clothes and dance naked in front of a camera. Hall would look at pornographic magazines with the two young girls and make them pose like the pictures. Hall had told A. that if anyone learned of what he had done, people would blame her for it.

A week after the 2001 interview, A. signed an affidavit repeating what she had told the officers. Wendy also signed one about what L. had told her in 1993 and what Hall had said when Wendy confronted him about it back then.

That same day, an investigator with the Sheriff's Office conducted a covertly recorded telephone conversation between Wendy, A., and Hall. During that call, Wendy told Hall that she had originally thought he had only touched A., but that A. had recently told her about the additional abuse. Hall responded, "[N]o, no . . . there was no really, anything like that going on . . . I don't know what you asked." Wendy asked Hall what happened and if he had videotaped A. and K. or had sex with them. He denied doing that.

5

A. then got on the phone.  Hall called her "punkin" several times and said that he didn't "want this to tear [her] up."  He told her that he had "changed" and "learned his lesson" and that "a lot of it was just innocent play, but I got carried away."  He also attempted to blame A. and K.:  "[Y]ou guys [referring to A. and K.] got carried away, cause you and [K.] . . . was always into a lot [of] things and you just kind of [fell] into, into [K.'s] trap[;] you [know] what I'm saying or into that influence."  Hall told A. that she and K. "were in the experimenting stage and I . . . shouldn't have let you guys play along and I shouldn't have played along at the same time."  He told A. that he didn't want her "to feel bad" and that he didn't want "this" (apparently referring to his sexual abuse of her) "to hurt" her.  He also said that he was "easy to get a[]long with," and that A. should have "come to [him] and said listen I've got [a]n issue here."

A. listened to the man who had sexually abused her for several years talk about how he had "changed," and was "easy to get a[]long with," and heard him describe his abuse of her as "innocent play."  When she responded at all, A. made short, seemingly disengaged comments like "Yes sir," and "Yeah."  When Hall asked A. what was "messing with [her] head," she told him that she was "having flashbacks and things."  Crying, she told Hall she could "see . . . [him] pulling [his] penis out and sticking [hers and K.'s] mouth[s] on it and stuff."  Hall responded by saying that he didn't "want [A.] to think that [she] did anything wrong."

6

He mentioned again that it was "an experimental time," and said that he would "catch" A. and K. "with nothing on running around" and then A. and K. would pull his pants off.  Hall admitted to taking "advantage of the situation," said he "was not mature enough to say no" to the young girls, and admitted that it "was wrong of me just to go ahead and play along."  At the time he "was not mature enough to say no," according to Hall, he had been 34 years old, a quarter of a century older than the two little girls.

The next day, there was another covertly recorded phone conversation, this time between just Wendy and Hall.  In that call, Hall denied videotaping A. and K., saying that, although the camera was set up and displaying images on the TV, it was only because A. and K. wanted to see themselves.  Hall said he would "have never" made pornographic videos of A. and K. because "that would have been stupid and[,] you know[,] serious."  (When police later searched his house, they found a "stupid and . . . serious" pornographic video he had made of himself sexually abusing K., his daughter.)  He denied sticking his penis in their mouths or penetrating them with his fingers, saying there was only "a little touching."  He said he "was going through a lot at the time," and "didn't have enough control over myself to realize what I was doing" but that he had changed.  Wendy pushed him, saying it was hard to believe that A. had made everything up.  Hall responded, "No, no, no . . . But I'm not sure . . . I really don't remember."

Hall claimed to Wendy that when A. and K. were naked he would "let them do what ever [sic] they wanted to do [and he] let them" — the young girls — "take control." He said when they took control "it was like I had no conscience after that." Hall continued to refer to the "experimental stage" that he claimed A. and K. had been in, saying that he acted like a kid "right along with them," and that was wrong. He attempted to justify what he had done by saying: "I mean if anything came up most of the time these [two] youngins we[r]e the ones that instigated it." He described the girls while he had been abusing them as young children "having fun," "experimenting," and "getting away with things," and himself as "this grown man going to, getting to, crawling down to their level."

Hall denied to Wendy that he had ever instructed A. not to tell anyone. He claimed instead that A. had not told Wendy because she had been "getting away with something that normally she wouldn't be able to get away with" and didn't want Wendy to know. He said that "there was no real blame[,] you know," but he had "always felt so guilty about it" and blamed himself "more than anything." At the same time, he admitted that "what I was doing was not right" and insisted that "what I had done was not me." He said that A. "knows I love her and I've never done anything to hurt her."

In that same recorded phone conversation, Hall also denied to Wendy that he had abused L. (her younger daughter, who was three years old at the time), stating

8

that once, while the young girls were getting dressed, he had "given [L.] a raspberry on her stomach and I guess it was a little too close down there."

Officers from the Escambia County Sheriff's Office arrested Hall that day. During a post-arrest interview, he admitted that he had touched A.'s and K.'s breasts and vaginas and said that they may have touched his penis. He claimed — as he had during the phone call — that he had hooked up the video camera only so A. and K. could see themselves on the TV. He told of watching the young girls "mess around with themselves," and described how he had "allowed" them to pull his clothes off and how it became a game. He "guessed" A. and K. had touched his penis, but he claimed not to recall whether he had the young girls give him oral sex.

Hall consented to a search of his house and led detectives to several boxes of tapes and magazines. One tape featured the hand of what appeared to be an adult male fondling a young girl's genital area while she looked at a pornographic magazine. The girl was between five and seven years old. The hand in the video had a tattoo on it that matched a tattoo on Hall's hand. Detectives showed K., Hall's older daughter, still photographs of the tape, and K. said she thought she might be the child in the video. Other tapes Hall had also featured nude children, such as "child development documentaries with nude children" and "third world tribal shows with nude children."

9

Four months later, in May 2002, Wendy and A. were deposed. They each testified in their depositions to what they had already told law enforcement. A. also discussed some more specifics about Hall's abuse of her. She said she remembered "getting in trouble for things [she] didn't do" — that Hall would sometimes "take [her] off to the back and he would touch [her] and stuff like that. And he would tell [her she was] a bad girl and stuff like that." Discussing Hall's abuse of her, she said that she "remembered it . . . like I remember anything else. I guess I've just always known it," and that, even though she "tr[ies] not to" think about it, "it comes to [her] in dreams and stuff and then [she'll] start thinking about it."

A. discussed how, in December 2001, she had "cut up [her] arms real bad" and her mom had sent her to a treatment center in Florida. A. said she didn't know why she was cutting herself, but she spoke with counselors in the treatment center and told them what Hall had done to her. The counselors told her they believed her self-harm was a result of Hall's sexual abuse of her. A. said that, although she hadn't ever discussed the abuse with anyone before being at the treatment center, she talked to the counselors there because: "I was really scared about what was going on with me. I was really confused, so I just opened up and told them everything that's ever happened in my life."

10

In her deposition, Wendy also repeated much of what she had said in her statements to the police and in her affidavit. She also discussed A.'s mental health struggles over the years, noting how when A. "hit middle school, a lot of the depression set in," and A. "went through a lot of self destructing [sic]," including "cutting," and that Wendy "had no idea what was wrong." After A. had one episode of particularly severe self-harm, Wendy decided to send her to a treatment center because she "didn't know what to do," and she "was scared [A.] was going to end up killing" herself.

The doctors at the treatment center told Wendy that A.'s self-destructive behavior was normal for a child who had been sexually abused, and that they thought the behavioral and emotional problems A. had experienced "were because [she] had [been] sexually abused as a child." When Wendy heard that it made "[a] lot of things" make "sense," including A.'s history of nightmares. Wendy recounted how A. would "wake up having nightmares and would not tell you anything. [She] didn't want to tell you what the nightmare was about." But after hearing from the doctors, Wendy realized "it was nightmares — [A.] still has them, you know, to do with [Hall]."

Wendy testified that she was "very surprised" and "shocked" when she learned of the extent of Hall's abuse of A., and that she "wanted to kill him." She said that she "dealt and still [was] dealing with a lot of emotional feelings." When

11

she learned the extent of Hall's abuse of A., she asked one of her children, "When did this actually start?" Wendy said her daughter couldn't "pinpoint a time that it ever started. She said, Momma, it's just always been going on there [at Hall's house]."

Hall was charged in 2002 for some of his sexual abuse of A. during 1992 and 1993. He was arrested in January on two charges: one for sexual assault by an adult against a child under the age of 12, in violation of the version of Fla. Stat. § 794.011(2)(a) (2002) in place at the time, and the other for cruelty toward children by directing or promoting sexual performance by a child, in violation of Fla. Stat. § 827.071(3). In August of 2002, he pleaded no contest to two Florida sex offenses: one count of touching a person under 16 years of age in a lewd or lascivious manner, in violation of Fla. Stat. § 800.04(6), and one count of lewd or lascivious exhibition in the presence of a person less than 16 years of age, in violation of Fla. Stat. § 800.04(7). In spite of how severe and recurring his sexual abuse of the children had been, Hall received a sentence of only eleven-and-a-half months on each count to be served concurrently. He was required to register as a sex offender after he was released in 2003.

That was not the end of Hall's sexual crimes involving children.

12

B.  Hall's Sex Crimes Against Children in This Case

In 2016, Canadian law enforcement officers discovered on electronic devices seized in Ontario a large number of images and movies, including child pornography.  Some of that evidence was referred to law enforcement officers in this country and eventually made its way to a Homeland Security Investigations Office in Alabama.  Included in it were 324 images of two minor girls — B., Hall's youngest daughter, and H., who was the stepdaughter of William Roberts, Hall's "best friend[]," who was also related to him by marriage.  Some of the images of those two girls were sexually explicit.

In an interview with H. on March 14, 2017, HSI agents showed her some of the 324 images that had been seized in Canada, and she identified herself in three of the pornographic ones.  H. stated that those images of her were taken three or four years earlier, when she was 13 or 14 years old.  She said that two of the three pornographic images were taken at the house of Roberts' friend, whom she knew as "John."  According to H., the other pornographic image was taken inside Roberts' work van, and John took it using a digital camera.  She identified Hall as the man she had known as John.

Roberts was arrested two days later for production of child pornography.  On March 27, 2017, eleven days after his arrest, Roberts killed himself.

13

A federal search warrant was executed at Hall's home in Florida on June 1, 2017. During the search, Hall agreed to be interviewed. He told the agents that H. "hardly ever wore clothes," dressed like a "little whore," and liked attention. He also said that H. was "all over" Roberts (her stepfather) and that he felt bad for Roberts because H.'s behavior (when she was a 13- or 14-year-old child and Roberts was a grown man) got Roberts in trouble and led to his death. Hall admitted taking a picture of H. when her vagina was exposed. He also admitted taking sexually suggestive pictures of B., his biological daughter, when she was about 11 or 12 years old.

The agents asked Hall if they would find any child pornography on the computers in the house, and he replied "no." When they reminded him that it is a federal crime to lie to a law enforcement officer, and then asked him again, Hall again said they wouldn't find any child pornography. He was, of course, lying — or we wouldn't be here.

The agents seized Hall's computers and phone. A forensic analysis of his computer was conducted, but it was limited to the 77-day period between March 16, 2017, and June 1, 2017, the date it was seized. The forensic examination was limited to that period because the hard drive in Hall's computer had been replaced and/or reformatted on March 16, 2017, destroying any evidence of what had been on it before that date. Probably not coincidentally, that was also the date Hall's

best friend and fellow child pornographer Roberts had been arrested on charges of production of child pornography.

In any event, during the 77-day period for which there was evidence on the computer, Hall had searched for child pornography on a Russian website known for distributing it. The search terms he used included "preteen, ang[el], kidd[y], and loli.[2] His searches apparently were successful because during that same period Hall had also downloaded about 100 images of child pornography, including some images of children under the age of 12, and some images that were sadistic and masochistic. Three of the images showed an adult penis penetrating a prepubescent girl. Many of the images focused on the young girls' vaginas.

In addition, the forensic analysis also showed that Hall had bookmarked websites featuring "infants, toddlers and preteens in various stages of undress and in sexually explicit poses." Finally, the analysis revealed that a counter-forensics software program called "Security File Shredder" had been installed on Hall's computer. This program allowed someone to "digitally shred files at the touch of a button." Apparently, when law enforcement showed up Hall did not have time to touch the button.

---

[2] "Loli" is presumably a reference to the novel Lolita, written by Vladimir Nabokov, which concerns a middle-aged man's sexual obsession with a twelve-year-old girl.

15

A few weeks after searching Hall's house and seizing his computer and phone, law enforcement interviewed B., Hall's younger daughter and the subject of some of the child pornography images that had started the investigation into Hall. B. said that Hall had taken sexually explicit pictures of her when she was about 9 or 10. She confirmed that she was the young girl in 11 of the images that had been discovered on the computer in Canada. B. also told the agents how Hall had called the images of her "model pics" and had traded them with a man in the Philippines named Art for images of his children.

B. recounted an incident that occurred around 2002 when Hall told her to rub his penis on his clothes. That happened when she was about 6 years old and right before Hall had begun to serve his sentence for his earlier sex abuse of A. B. also stated that she remembered seeing a naked picture of her one-year-old female cousin on Hall's phone.

As a result of the 2017 investigation, Hall was charged with one count of receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2) and (b)(1), and one count of possession of child pornography that involved a prepubescent minor, in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2). In return for his guilty plea to the receipt of child pornography charge in Count One, the government dismissed Count Two. The district court accepted the guilty plea.

C. <u>Sentencing</u>

The probation office prepared a presentence investigation report that calculated an advisory guidelines term of 180 months in prison. The calculations began with a base offense level of 22 for the receipt of child pornography offense. <u>See</u> U.S.S.G. § 2G2.2(a)(2). The following adjustments were recommended: first, a two-level reduction because the offense for which Hall was convicted did not involve the intent to traffic or distribute the material, <u>see id.</u> § 2G2.2(b)(1); second, a two-level increase because Hall's child pornography involved "a prepubescent minor who had not attained the age of 12," <u>id.</u> § 2G2.2(b)(2); third, a four-level increase because Hall's offense involved material that portrayed "sadistic or masochistic conduct or other depictions of violence," <u>id.</u> § 2G2.2(b)(3)(4); fourth, a five-level increase because Hall had "engaged in a pattern of activity involving the sexual abuse or exploitation of a minor," <u>id.</u> § 2G2.2(b)(5); fifth, a two-level increase because Hall had used a computer to receive the child pornography, <u>see</u> <u>id.</u> § 2G2.2(b)(6); and sixth, a two-level increase because Hall had possessed "at least 10, but fewer than 150 images of child pornography," <u>id.</u> § 2G2.2(b)(7). With a three-level reduction for acceptance of responsibility, <u>see id.</u> § 3E1.1(a), (b), Hall wound up with an adjusted offense level of 32.

Hall had no criminal history points (his 2002 convictions were too old to be counted, <u>see</u> U.S.S.G. § 4A1.2(e)(3)), which resulted in a criminal history category

17

of I.  Based on his offense level of 32 and his criminal history category of I, the advisory guidelines range was initially calculated at 121 to 151 months.  That range was automatically elevated to the statutorily required minimum of 15 years (180 months).  See U.S.S.G. § 5G1.1(b); 18 U.S.C. § 2252A(a)(2), (b)(1).

Hall objected to some parts of the PSR, including the recommendation that the court impose a five-level enhancement under § 2G2.2(b)(5) for a pattern of abuse or exploitation of a minor.  That recommendation had relied in part on the conduct for which Hall had been convicted in 2002.  Part of his objection to that enhancement was that the statement of that conduct in the PSR was inaccurate.  In response, the government submitted the 2002 case file and certified copies of the depositions Wendy and A. had given during that investigation and prosecution.  The 2002 case file contained the police report, arrest warrant and statement of probable cause, Wendy's and A.'s affidavits, transcripts of the covertly recorded phone calls between Wendy, A., and Hall, and photos of Hall and the tattoo on his hand.

At the sentence hearing, which took place in 2018, Hall reiterated his arguments against the § 2G2.2(b)(5) pattern of abuse or exploitation enhancement and the evidence on which it was based.  He asserted that he "did not admit to touching the children" in the 2002 case.  He also argued that the contents of the

18

2002 case file and the depositions of Wendy and A. should not be admitted because they were unreliable hearsay.

The district court overruled Hall's objection, finding the 2002 case file and deposition evidence reliable, in part because the sworn statements, depositions, and police report all told roughly the same story. The court explained that the 2002 case file and Wendy's and A.'s depositions showed "more similarities" in the statements Wendy and A. made "than there [are] arguable inconsistencies," and that it actually was "not aware of any inconsistencies" within or between their statements. Referring to Wendy's and A.'s affidavits and depositions, the court also found that "the sworn statements of those involved back in the 2002 case, like I said, they're consistent with one another. And we have sworn testimony, which also provides a layer of reliability." Not only that, but the court also pointed out that Hall's own statements in the recorded telephone conversations corroborated the other evidence that Hall had sexually abused K., A., and L. The court overruled Hall's objection to admitting the 2002 case file and depositions of Wendy and A., and his related objection to the five-level § 2G2.2(b)(5) pattern of abuse or exploitation enhancement.

Speaking to the court, Hall said that he was "very sorry for the things that [he had] done" and "for the man that sits here before you." He said he "never wanted to hurt anybody." He said he was "always bullied" as a child and "I guess,

19

over the years it got to me." He said, "I hate myself, literally I hate myself for what I've become," and that he was "willing to do whatever it takes to get . . . help." He said he had "turned [him]self over to God," that he "promise[d] not to do this ever again," and that he just wanted "a chance to spend a little more time with [his] wife." He did not apologize to any of his victims or their families for wrecking their lives, shattering their emotional well-being, and blaming his child victims for his deviant conduct toward them. He did not mention them at all.

During the sentence hearing, H.'s mother read into the record a statement from H., who was Roberts' stepdaughter. In it, H. said:

> I want you to know that John [Hall] is honestly and truly, from the bottom of my soul, the worst person I have met in my 18 years. You both [John Hall and Christine, his wife] knew that Bill [Roberts] molested me, and all three of you took advantage of what I was convinced I should wear to use me for child pornography. You molested your own daughter. And what kind of person does that? What kind of mother keeps her other children around him, helps him, supports him, allows your grandchildren to be in the same terrible position? The heartless kind of people who deserve to go to jail. You have caused myself and who knows how many others to live a life of constant fear, scared to trust anyone. I don't hate anyone. But John and Christine Hall, I hate you with every fiber of my body.

After reading H.'s statement for her, her mother read her own statement. Her statement showed how deeply Hall's criminal abuse of her daughter had affected both mother and daughter. She began by stating that she was speaking to both Hall and his wife Christine because they both "have blame." She continued:

20

You have no idea the pain and heartache you have caused for me and my children, plural.  When something like this happens, it has a ripple effect.  Everyone is hurt in some way.  The hate I have for you, John, I can't even begin to explain. . . . I will pray that I can somehow forgive you so this hatred in my heart does not kill me.  I hope and pray that you get a very long sentence.  If not, I will pray[] even harder that you never make it out of prison.  You and Bill [Roberts] destroyed my baby girl's innocence.  You and Christine were well aware that Bill was molesting my child, and didn't do or say anything about that.  You both should be charged [as] an accessory to that crime.  John, you are a very, very sick man to want to take pictures of children, babies, even your own children, video recording them.  Why?  Can you even answer that honestly. . . . Y'all are sick.  You disgust me.  And one day you will burn for this.  That will be the ultimate price that you pay in eternity.  And when it's your time to pass, I pray you die a slow, agonizing, painful death so you have plenty of time to think about all the wrong you have done to [y]our own children and to other children, including H.  You don't ever deserve any happiness, just pain and sorrow.  Having to read what my own child wrote broke my heart all over again.  She does not deserve any of this.  No child does.  I had to pray daily while you were still out walking the streets just to make it through the day without hurting you in some way just so you could feel my pain.  Think about that.

After hearing arguments from counsel and the statements of H. and her mother, the district court discussed the factors it considered in determining Hall's sentence.  It noted that the criminal conduct "in this case is certainly serious" and "of concern."  Specifically, Hall "had received and w[as] possessing approximately 100 images of child pornography, some of which included an adult male penetrating a prepubescent female with his penis" — images that had been part of the basis for the court's applying an enhancement for sadistic and masochistic behavior under U.S.S.G. § 2G2.2(b)(4) (a ruling that Hall does not challenge on

appeal). The court expressed its concern that Hall had searched for child pornography on a Russian website and possessed "a security file called 'Shredder,'" which is "destruction-type software."

It also noted that the evidence showed that Hall had abused "at least five victims":

> [Y]ou abused your own daughter, K., at the age of seven to eight, as well as two other children, two sisters, one of whom was approximately the same age as your daughter, and the other of whom was three years old.
> . . . [A]nd . . . the abuse lasted for — five years? And again, this included your own daughter and then it included two children that were entrusted to your care. You were in your thirties at the time. And the abuse included digital penetration, it included oral sex both by you and also the girls on you. And again, it includes a three-year-old, as if a seven-year-old is not bad enough. These are young children.

The court recounted that Hall's conduct in the 1990's led to his conviction for two sex crimes, although the court stated that it "d[idn't] know why it didn't include three counts." Still referring to Hall's 2002 convictions, the court noted that the investigation leading to those convictions resulted in the search of his home which "revealed a collection of . . . well organized tapes and magazines and also included the discovery of a video of [Hall] abusing . . . a child while. . . she was looking at a pornographic magazine. And this was another young child."

The court observed that "within five years" of Hall's release from his 11-and-a-half-month "jail sentence — not a prison sentence —" Hall began "abusing [his] other daughter, B., who was seven or eight at the time, and that continued

22

until she was approximately 13 years old." And "[i]f all of that wasn't enough," then Hall began "producing child pornography involving H.," in 2013 or 2014, "again as a sex offender," when H. was 11 or 12. The court said: "And it's difficult to even — to contemplate this, but you were producing that child pornography . . . knowing that her stepfather [Roberts] was sexually abusing her. And you did nothing to — obviously you did nothing to stop that abuse . . . ." Instead, and "worse, [you] encouraged . . . [the abuse] through the photographs."

The court found that, although Hall "should have appreciated the devastation that [his] actions would have on these children," he showed "no insight into the seriousness of [his] actions and into the serious harm and the consequences to these children." It noted A.'s "serious emotional and severe emotional problems, including self-mutilation," and it told him, "You certainly robbed [your victims] of their innocence."

Despite that, the court pointed out that in Hall's allocution and throughout the PSR's recounting of what he had said to the probation officer, it "didn't hear anything from [Hall] as far as . . . remorse in that respect, any insight into, again, into that harm to [his victims]." What the court did see reflected in Hall's statements was "an attitude involving this abuse that is just inexplicable. . . . [N]ot only did you commit the abuse, but then you blamed the girls." Describing

23

comments Hall made about taking pornographic pictures of H. as an 11- or 12-year-old, the court said:

> [Y]ou did the same thing then, you blamed H.  She was 11 or 12 years old, she's being raped and abused by her stepfather, and your view of that — I think you even said they were going to get married.  I guess you've just normalized it and rationalized it in your own mind.  But that's what makes you so dangerous is that you — it's clear to me that you do see this as certainly acceptable, normal.

Stating that it had "given this a lot of thought," the court expressed its belief that Hall was not going "to outgrow this desire that you have for young girls."  As a result, the court was concerned for "the public and the children in our community."

Regarding Hall's guidelines term of 180 months (15 years), the court said "[t]he 15-year mandatory minimum . . . doesn't take into account much of what I just discussed" — which the court characterized as "the devastation" that Hall had left "in [his] wake."  It said that Hall's 15-year guidelines term "does not take into account H. or B., frankly."  And it noted that Hall "could have been charged with producing child pornography at a minimum" for the crimes he committed against H., in which case he "would have been looking at a mandatory minimum of 35 years in prison just for that, not considering everything else."

In light of the fact that Hall had "committed several acts of child sex offenses as a [registered] sex offender," the court found that "supervision for you, Mr. Hall, is [not] an option."  It reached that conclusion because the "status [as a

24

sex offender] and that threat that goes along with [registering as a sex offender] doesn't seem to have deterred you at all." Finally, it told Hall:

> I can't impose a life sentence in your case. If I could, I would. And it would be consistent with sentences I've imposed for similar offenders under similar circumstances in the past. The maximum sentence that I can impose in your case under these circumstances is 40 years, and that's the sentence I'm going to impose.

When pronouncing Hall's 480-month sentence, the court recognized that, "certainly this sentence constitutes a significant upward variance from [the] guideline range." It explained, "I have considered all of the factors in 18 U.S.C. [§] 3553(a), and I've considered the unique circumstances and facts of Mr. Hall's offense of conduct [sic], but also his personal history and characteristics, and I do believe that this is an appropriate sentence." The court also said that, to the extent it had erred in any of its legal rulings, its "sentence would be the same, again, for the reasons noted."

In its written statement of reasons, the court further explained:

> Supervision is not an option in this case. The defendant continued to engage in sexual acts against children after his previous state conviction for similar conduct. His prior conviction and designation as a sex offender had no deterrence on the defendant's propensity to victimize children. . . . To protect the public, the court imposes a sentence of 40 years, which is the statutory maximum sentence. Regardless of the guideline objections and rulings in this case, the court would have imposed this sentence as it is the only way to ensure the safety of the public.

> This sentence of 480 months . . . constitutes a significant upward variance. The court believes this sentence is appropriate based on the

particular facts of this case, as previously outlined. Further, this sentence will protect the public from the defendant committing similar crimes while he is incarcerated.

Hall appeals, challenging his 480-month sentence.

## II.  STANDARDS OF REVIEW

We review de novo constitutional challenges to a sentence. United States v. Ghertler, 605 F.3d 1256, 1268 (11th Cir. 2010). We also review de novo questions of law dealing with the guidelines. United States v. Kapordelis, 569 F.3d 1291, 1314 (11th Cir. 2009). We review a district court's factual findings only for clear error. United States v. Lebowitz, 676 F.3d 1000, 1015 (11th Cir. 2012). And we review the substantive reasonableness of the sentence only for an abuse of discretion. Gall v. United States, 552 U.S. 38, 51 (2007).

## III.  ANALYSIS

Hall makes three contentions on appeal: (1) the district court violated his due process rights by sentencing him on the basis of unreliable hearsay evidence; (2) the district court's above-guidelines sentence was actually an upward departure, not a variance, for which it was required to, but did not, provide notice; and (3) regardless of any other error, the district court's sentence was substantively unreasonable. All his contentions fail.

A.  Reliance on Hearsay Evidence

First, Hall contends that the district court erred in relying on evidence from the 2002 case file and the depositions of Wendy and A. as the basis for imposing the significant upward variance to the maximum sentence allowed by law.  Hall asserts that the court violated his due process rights by relying on that evidence to increase his sentence because it was unreliable hearsay and should not have been considered.

A district court has "wide latitude in the kinds of information it may consider in the sentencing decision" and may consider hearsay evidence as long as "the defendant [has] an opportunity to refute it and [the evidence bears a] minimal indicia of reliability."  United States v. Giltner, 889 F.2d 1004, 1007 (11th Cir. 1989) (emphasis added).  A defendant challenging a sentencing court's reliance on hearsay evidence bears the burden of demonstrating that the evidence lacks the "minimal indicia of reliability."  United States v. Bourne, 130 F.3d 1444, 1447 (11th Cir. 1997).  To prevail on a challenge to a sentence based on the consideration of hearsay, "a defendant must show (1) that the challenged evidence is materially false or unreliable and (2) that it actually served as the basis for the sentence."  Ghertler, 605 F.3d at 1269 (emphasis added).  Hall has not met this burden because he has not shown that the evidence of his earlier sexual abuse of

27

K., A., and L., contained in the 2002 case file and depositions of Wendy and A., was materially false or unreliable.  He has not even come close.

The 2002 case file and the depositions of Wendy and A. contain more than sufficient "indicia of reliability" to be considered in sentencing, and Hall had an opportunity to refute that evidence but he didn't.  As the district court explained, Wendy's and A.'s descriptions of what Hall had done in 1992 or 1993 were consistent each time they were interviewed and were consistent with each other's statements.  Their statements were also corroborated by the evidence law enforcement officers found when they searched Hall's house in 2002.  Cf. Ghertler, 605 F.3d at 1270 (concluding that corroborative evidence is a sign of reliability).  Both Wendy and A. gave sworn testimony in the affidavits included in the 2002 case file, and also in their pre-trial depositions in that case, and both of their sworn statements were consistent with each of their other statements.  See United States v. Reme, 738 F.2d 1156, 1168 (11th Cir. 1984) (concluding that statements under oath or where defendant could cross-examine declarant are "more likely to be trustworthy and reliable").  And Hall's attorney was able to, and did, ask Wendy and A. questions at their depositions about their prior sworn statements.  Cf. id.

Hall's assertions at sentencing that he has always denied sexually abusing A. and K. do not undermine the reliability of the statements of Wendy and A.  Hall's assertions are not only self-serving, they are false.  To realize that they are false,

28

one need look no further than Hall's own admissions during the covertly recorded phone conversations that Wendy and A. had with him.

During those conversations, Hall said there was "a little touching," that he had "played along" with A. and K., who were "in the experimenting stage," and that he had taken "advantage of the situation" when A. and K. had "nothing on running around" and would pull his pants off.  He tried to blame "these [two] youngins" for instigating whatever "came up."  He said that "what I had done was not me" and "what I was doing was not right."  When Wendy reminded Hall of telling him in 1993 that her little three-year-old daughter L. said that he had bitten her in the vaginal area, his response was that he had once given L. "a raspberry on her stomach and I guess it was a little too close down there."

Not only that, but Hall told law enforcement officers that he had watched A. and K. "mess around with themselves," and that he played a game with the children in which he allowed them to pull off his clothes.  He admitted to the officers that he had touched A.'s and K.'s breasts and vaginas, and that they may have touched his penis.  Cf. Reme, 738 F.2d at 1168 (concluding that statements against defendant's punitive interest "bear sufficient indicia of reliability").

The only evidence that contradicted the mass of evidence that Hall sexually abused A., K., and L. in the early 1990's was Hall's mostly self-serving statements, statements that shifted from outright denials to claims that he could not recall to

29

partial confessions.  And there is another fact that speaks volumes about Hall's credibility: he lied point-blank to federal law enforcement officers in this case when asked whether there was any child pornography on his computer, and then after being warned that it was a federal crime to lie to them, he repeated the lie.

The district court did not err in concluding that there were sufficient indicia of reliability for the hearsay evidence in the 2002 case file and the depositions of Wendy and A. to be considered in sentencing.[3]

## B.  Notice of Departure

Second, Hall contends that even though the district court characterized his sentence as an upward variance from the advisory guidelines term, the court actually imposed an upward departure.  And Hall argues that doing so was error because the court did not provide the notice Federal Rule of Criminal Procedure 32(h) requires in such a situation.[4]  Hall is wrong.

---

[3] To the extent Hall also challenges the district court's application of the five-level enhancement under U.S.S.G. § 2G2.2(b)(5) for engaging in a pattern of activity involving the sexual abuse or exploitation of a minor, that challenge fails for several reasons.  First, given the evidence in the 2002 case file and the depositions of Wendy and A., that enhancement by its terms clearly applies.  Second, the district court clearly stated that it would impose the same sentence even if it had made a guidelines error.  See United States v. Barner, 572 F.3d 1239, 1248 (11th Cir. 2009) (holding that any guidelines calculation error is harmless if district court judge clearly states that he would impose the same sentence even if he erred in the calculations).  And third, because Hall's guidelines term was elevated to the statutory minimum, his guidelines term would have been the same with or without imposition of the enhancement for a pattern of abuse or exploitation.  See U.S.S.G. § 5G1.1(b); 18 U.S.C. § 2252A(a)(2), (b)(1).

[4] Rule 32(h) states:  "Before the court may depart from the applicable sentencing range on a ground not identified for departure either in the presentence report or in a party's prehearing

30

Although they may lead to the same result (a sentence outside the advisory guidelines range) a variance and a departure reach that result in different ways. A variance is a sentence imposed outside the guidelines range when the court determines that a guidelines sentence will not adequately further the purposes reflected in 18 U.S.C. § 3553(a). See Gall, 552 U.S. at 49–50; Kapordelis, 569 F.3d at 1316. A departure, by contrast, is "a term of art under the Guidelines and refers only to non-Guidelines sentences imposed under the framework set out in the Guidelines," including the departure provisions. Irizarry v. United States, 553 U.S. 708, 714 (2008). A court must give the parties advance notice if it is considering departing from the guidelines range calculated in the PSR, but it need not give advance notice if it is considering varying from that range. Id. at 714–15.

To determine whether the district court varied or departed, we look, unsurprisingly, to the court's reasoning and what it said about that reasoning. Specifically, we look at whether it cited a specific guidelines departure provision in setting the defendant's sentence, or whether its rationale was based on the § 3553(a) factors and a determination that the guidelines range was inadequate. See Kapordelis, 569 F.3d at 1316.

---

submission, the court must give the parties reasonable notice that it is contemplating such a departure."

31

In this case, Hall didn't raise this objection in district court, so we review only for plain error.  See United States v. Bradley, 644 F.3d 1213, 1293 (11th Cir. 2011).  But that limited standard of review makes no difference because there is no error.  See id. ("To find plain error, [a defendant] must convince us that the district court erred, that the error was plain, and that it prejudicially affected his substantial rights.") (emphasis added).

The reasons the district court gave for imposing a sentence above the guidelines term (a one-number "range" in this case) are reasons grounded in the § 3553(a) sentencing factors, not in the departure provisions of the guidelines alone.  In its explanation, the district court discussed the § 3553(a) factors extensively, focusing especially on Hall's lengthy and ongoing history of abusing young girls, even while being a registered sex offender, and the corresponding need to protect the public from Hall in light of that history; Hall's failure to show remorse; and Hall's pattern of consistently blaming his victims, victims who were young children.  The court found that the advisory guidelines term of 15 years was "insufficient to protect the public from future crimes of the defendant."  See § 3553(a)(2)(C) (requiring that the sentencing court "consider . . . the need for the sentence imposed . . . to protect the public from further crimes of the defendant").

And in its written statement of reasons, the district court cited nine reasons grounded in the § 3553(a) factors that it relied on to impose Hall's sentence of 480

months.  It found that a 480-month sentence of imprisonment was necessary to

address: (1) Hall's extreme conduct; (2) Hall's uncharged conduct; (3) Hall's role

in the offense; (4) the impact on Hall's victims; (5) other aggravating factors;

(6) Hall's lack of remorse; and (7) just punishment; and was necessary to: (8)

provide adequate deterrence; and (9) protect the public.  All of those reasons relate

to § 3553(a) factors.  See § 3553(a).

Not only did the sentencing judge base her decision on the § 3553(a) factors

and the fact that the advisory guidelines term was insufficient to serve the goals of

sentencing embodied in those factors, and not only did she not refer to any

guidelines departure provision, she also stated that she was varying upward.  She

did not say she was departing upward.  In view of the experience and knowledge of

the district court judge in this case, that counts for something, especially given that

it is completely consistent with her stated reasons.  Cf. Kapordelis, 569 F.3d at

1316 (explaining that district court applied a variance, not a departure, because its

rationale was based on § 3553(a) factors).

Hall's arguments to the contrary are unpersuasive.  He points out that the

guidelines state that the inadequacy of an enhancement under U.S.S.G.

§ 2G2.2(b)(5) for a pattern of abuse can justify an upward departure.  See § 2G2.2,

cmt. 9 ("[A]n upward departure may be warranted if the defendant received an

enhancement under subsection (b)(5) but that enhancement does not adequately

33

reflect the seriousness of the sexual abuse or exploitation involved."). But the fact that the work a variance does might also be done by a departure proves nothing. Given the breadth of the § 3553(a) factors and the number of departure provisions, there is substantial overlap between the two. That overlap resulted not from any original design logic or a master plan but instead from the felt needs of the <u>Booker</u> decision. <u>See</u> <u>United States v. Booker</u>, 543 U.S. 220, 243–65 (2005).

In any event, departures don't have dibs over variances. The usage numbers run in the opposite direction. During the most recent reporting period, for example, when imposing sentences above the guidelines range district courts used variances four times more often than departures. <u>See</u> United States Sentencing Commission, <u>2019 Annual Report and Sourcebook of Federal Sentencing Statistics</u> 84, Table 29 (reporting 364 total departures above the guidelines ranges and 1,431 variances above the guidelines ranges during that court year). If anything, sentencing law, or at least the federal judges who apply it, prefer variances.

What matters is that the grounds the district court gave for varying above the guidelines range fit comfortably under the § 3553(a) provisions; it doesn't matter whether they might also have fit under a departure provision. <u>See</u> <u>Irizarry</u>, 553 U.S. at 714 (holding that Rule 32's notice requirement applies only to cases in which the departure was based <u>solely</u> on "the sentencing guidelines, policy

statements, and official commentary of the Sentencing Commission"). The district court was not required to give notice of its inclination to vary upward.

### C. Substantive Reasonableness

Finally, Hall contends that regardless of the procedures the district court used to arrive at it, his 40-year sentence was substantively unreasonable. The burden is on him to show that sentence is unreasonable in light of the facts of this case and the § 3553(a) factors. United States v. Tome, 611 F.3d 1371, 1378 (11th Cir. 2010). We review the reasonableness of the sentence only for an abuse of discretion, and in conducting our deferential review we consider "the totality of the circumstances, including the extent of any variance from the Guidelines range." Gall, 552 U.S. at 51; accord Irey, 612 F.3d at 1165.

"A district court abuses its discretion when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." Irey, 612 F.3d at 1165 (quotation marks omitted). The district court commits a clear error of judgment "when it considers the proper factors," but "weighs those factors unreasonably, arriving at a sentence that does not 'achieve the purposes of sentencing as stated in § 3553(a).'" Id. at 1189 (quoting United States v. Pugh, 515 F.3d 1179, 1191 (11th Cir. 2008)).

35

The district court carefully considered the § 3553(a) factors, weighed those factors without making a clear error of judgment, and provided sufficient justification for the sentence it imposed.  Hall engaged in repeated acts of sexual abuse of children over a period of at least two decades.  He sexually abused a number of children, including both of his own daughters as well as both daughters of one friend and the stepdaughter of another friend.  Hall's depraved exploitation of young girls went on so long that when a shocked mother asked her child when it had begun, she answered, "Momma, it's just always been going on . . . ."

The evidence proved that Hall sexually abused children, and he produced child pornography, and he trafficked in child pornography, and he traded pornographic images he had taken of one of his daughters for those a man in a foreign country had taken of his daughter, and he downloaded from the internet numerous images of child pornography, some of which were sadistic and masochistic.  Even after he went to jail for sexually abusing children and was required to register as a sex offender when he was released, Hall continued to sexually abuse children.

And when he was caught, Hall blamed the victims, the very children he had sexually abused, calling one of them a "little whore" who liked attention.  One of his friends and fellow pedophiles committed suicide after being arrested on charges of sexually abusing his own underage stepdaughter.  Hall's reaction was to feel bad

36

for that grown man — not for the young girl the man had been molesting, because Hall thought it was the girl's fault, that she must have provoked the abuse since in his view, "that's just how [the young girl] was."

When asked about two of the girls who were seven and eight years old at the time he himself had sexually abused them, Hall (who had been in his thirties) claimed that "if anything came up most of the time these [two] youngins we[r]e the ones that instigated it." He viewed his sexual abuse of them as simply "let[ting] them do what ever [sic] they wanted to do" and letting them "take control." It is no wonder the district court told Hall that one reason he was so dangerous is "that you do see this as certainly acceptable, normal."

The harm Hall inflicted on the young girls he molested and abused, sometimes over a period of years, is immeasurable. But the general outlines of it can be described. Consider, for example, the effect his crimes had on A. Hall began sexually abusing her when she was seven or eight years old, and he continued doing it for several years. He told A. that if anyone learned what he was doing to her, people would blame her. When A.'s three-year-old sister told their mother that Hall had bitten her in the vaginal area and had done the same to A., their mother asked A., who cried but refused to talk about it.

Hall's sexual abuse of A. caused her to have nightmares about him. She would wake up from having them but not want to tell her mother what they were

37

about.  She has not been able to escape the memories of Hall's abuse.  Even though she "tr[ies] not to" think about it, "it comes to [her] in dreams and stuff and then [she'll] start thinking about it."

A. began suffering depression in middle school and started engaging in self-destructive behavior, including cutting herself.  She cut herself so severely on one occasion that her mother "was scared [A.] was going to end up killing" herself, so she sent her to a treatment center.  A. "was really confused" and "was really scared about what was going on" with her.  So she told the doctors about everything Hall had done to her, which she had not shared with anyone before.  The doctors concluded that her behavioral and emotional problems, including the self-harm, were caused by the sexual abuse Hall had inflicted on her when she was a child.  As H., another victim of Hall's sexual depravity, told the district court, Hall had caused her and "who knows how many others to live a life of constant fear, scared to trust anyone."

As the sentence hearing statements of H. and her mother show, there is another harm that Hall inflicted on his victims, which should not be discounted: He caused both of them, despite their best efforts, to hate, to really hate.  At the sentence hearing, H. told the judge that she didn't hate anyone, except for Hall and his wife, whom she hated "with every fiber of my body."

In her statement, H.'s mother told Hall that because of "the ripple effect" of all "the pain and heartache" he had caused her and her children, and how he had "destroyed [her] baby girl's innocence," she prayed he would "die a slow, agonizing, painful death so that [he would] have plenty of time to think about all the wrong [he had] done to [his] own children and to other children, including H." Realizing that even fully justified hatred can consume those who harbor it, she also told Hall, "I will pray that I can somehow forgive you so this hatred in my heart does not kill me." We do not know which, if either, of those two prayers may be answered.

What we do know is, as the district court found, that Hall caused serious and lasting harm to his victims and others, that he lacks remorse, that he poses a danger to the public, particularly to little girls, and that a 40-year sentence is reasonable in light of those findings and the goals of sentencing. And we know that Hall's sentence is consistent with our previous recognition that "[c]hild sex crimes are among the most egregious and despicable of societal and criminal offenses." United States v. Sarras, 575 F.3d 1191, 1220 (11th Cir. 2009). This case is a sad reminder of just how "egregious and despicable" they can be.[5] Id.

---

[5] Our opinion in Irey contains a list of cases involving egregious and despicable sex crimes against children that resulted in sentences comparable to the one imposed in this case. See 612 F.3d at 1220–21 (listing 13 cases involving sex crimes against children and the sentences imposed). We looked to those examples in Irey because § 3553(a) requires district courts in sentencing, and courts of appeals in reviewing sentences, to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been

**AFFIRMED.**

---

found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  The sentence the district court imposed on Hall is not out of line with the sentences imposed in those 13 cases.