[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13930

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

J. CRUZ CORTERO-ROMAN,
a.k.a. Cruz Roman,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:22-cr-00089-CEM-EJK-1

_____

2                    Opinion of the Court                    22-13930

Before ROSENBAUM, ABUDU, and TJOFLAT, Circuit Judges.

PER CURIAM:

J. Cruz Cortero-Roman was sentenced to 180 months, or fifteen years, in prison for illegal reentry, in violation of 8 U.S.C. § 1326(a) and (b)(2). The applicable Sentencing Guidelines range was eight to fourteen months, though illegal reentry carries a statutory maximum of twenty years.[1]  8 U.S.C. § 1326(b)(2). Cortero-Roman appeals his sentence as procedurally and substantively unreasonable and seeks reassignment of his case upon remand to a different judge.

We find no procedural error. As for substantive reasonableness, we are unable to evaluate the sentence because the district court did not sufficiently explain its decision to allow for meaningful review. We therefore remand the case to the district court for further consideration and to explain how it arrives at whatever sentence it imposes. But we deny Cortero-Roman's request for reassignment to a new district judge. Our review of the record shows that the district judge was fair and impartial, and we find no basis for reassignment.

---

[1] Generally, the statutory maximum for illegal reentry is two years. *Id.* § 1326(a). But it increases to a twenty-year maximum for defendants like Cortero-Roman, "whose removal was subsequent to a conviction for commission of an aggravated felony." *Id.* § 1326(b)(2).

## I.    BACKGROUND

Cortero-Roman pled guilty to one count of illegal reentry to the United States.  At sentencing, the presentence investigation report ("PSR") revealed a lengthy criminal history dating back to 1997, when Cortero-Roman was sixteen years old.[2]  His adult adjudications reflect that he has several convictions, including for battery (1999 and 2005), aggravated assault with a deadly weapon (2001), illegal reentry (2009), resisting an officer without violence (2006), two cannabis offenses[3] (2001 and 2009), and several license-related offenses[4] (2000, 2001, 2003, and 2009).  Cortero-Roman is also a known member of the gang SUR 13, dating back to his teen years.

While Cortero-Roman was on community control for his aggravated-assault-with-a-deadly-weapon offense, he violated it, and his supervision was revoked.  As for Cortero-Roman's adult battery conviction, part of his sentence prohibited "hostile contact"

[2] He has one conviction and two adjudications withheld from when he was sixteen and seventeen years old.  We don't discuss these run-ins with the law further but mention them only to give context for some of the district court's explanation for its sentence.

[3] These include possession of less than twenty grams of cannabis and drug paraphernalia (2001) and possession of more than twenty grams of cannabis and drug paraphernalia (2009).

[4] These offenses include driving while license suspended/revoked with knowledge (2000 and 2001), no valid driver's license and attaching tag not assigned (2003), and operating motor vehicle without valid driver's license (2009).

with his female victim.  And the circumstances surrounding Cortero-Roman's later resisting-an-officer conviction found Cortero-Roman "lying in the bushes in an attempt to conceal himself" when officers responded to a residence because of a "possible burglary in progress."  As it turned out, Cortero-Roman had a relationship with the woman who owned the home.  He gave officers a false name and four different dates of birth.  And records showed that a man was arrested at the same address a year earlier, using similar aliases and dates of birth.  While he was incarcerated on his illegal-reentry conviction, Cortero-Roman incurred nine disciplinary infractions, including for threatening bodily harm.

Cortero-Roman has also been deported three times:  at ages twenty-three (2004), twenty-five (2005), and thirty-one (2011).  He was convicted of illegal reentry once before, at age twenty-nine.  After his 2011 deportation, Cortero-Roman resided in Mexico.  He remained there for the rest of his thirties, returning to the United States by December 2021.  So during that ten-year period, Cortero-Roman did not sustain any arrests or convictions in the United States.  Rather, his next arrest in the United States occurred in March 2022, a few months after his return to the United States, when he was forty-one and was arrested (again) for domestic battery.

Because the district court accorded great weight to this incident, we recount the allegations here as they come from the police report.  The PSR, in turn, included this information.

At the time of the incident, Jennifer Abassian was Cortero-Roman's on-and-off-again girlfriend, and she and Cortero-Roman shared an eight- or nine-year-old son, though Cortero-Roman did not live with her. Abassian saw Cortero-Roman drinking alcohol in her yard with another man, and she asked them twice to leave. They didn't, but eventually, Cortero-Roman asked Abassian for a ride home. Abassian agreed. Abassian, Cortero-Roman, and their son were in the car. During the ride, Cortero-Roman demanded Abassian drive them back to her house. She said no. So he grabbed the steering wheel and swerved the car off the road. He pushed Abassian, cussed at her, and punched her in the chest and face, causing her to bleed—all while their son watched helplessly from the backseat. When Abassian slammed the brakes, Cortero-Roman punched her again and slapped her repeatedly.

Abassian was terrified. So she reluctantly agreed to drive Cortero-Roman back to the house. He continued berating her. And when they got back to her house, he ordered her inside. She went to the bathroom to document her injuries. When she came out, Cortero-Roman physically forced her into the bedroom and raped her. She resisted, but he continued. Once he eventually fell asleep, Abassian fled with her son to safety.

Abassian called the police and told them this wasn't the first time Cortero-Roman had sexually assaulted her. She said she wanted to press charges for the battery, but not the sexual assault, because she "did not want to subject herself to *another* extensive sex crime investigation at this time" (emphasis added). Officers

6                Opinion of the Court                22-13930

saw blood on Abassian's face and chin, and when they drove Abassian back to her house, they found Cortero-Roman asleep, naked, in her bed. The State ultimately did not prosecute the case.

But after Cortero-Roman's arrest based on this incident, the jail's booking system forwarded Cortero-Roman's information to a national database, and Immigration and Customs Enforcement officials discovered he was in the United States illegally. That led to Cortero-Roman's arrest on the charges here.

Returning to Cortero-Roman's sentencing, based on his prior convictions that weren't too old to count under the Guidelines,[5] Cortero-Roman's total offense level for his reentry offense was ten, and his criminal-history category was II. This placed his Sentencing Guidelines range as eight to fourteen months.

Neither the government nor Cortero-Roman sought a departure under the Guidelines.

During Cortero-Roman's sentencing, the district court considered character letters submitted on his behalf, including one that Abassian wrote.[6] Abassian was also present at the sentencing

---

[5] Almost all Cortero-Roman's adult convictions were too old to receive criminal-history points in his Guidelines calculation. *See* U.S.S.G. § 4A1.2(e). The only conviction that garnered criminal-history points was his 2009 conviction for illegal reentry. But the district court could still consider the earlier conduct, as well as similar adult criminal conduct for which Cortero-Roman was not convicted. *See id.* § 4A1.3(a).

[6] A letter from Cortero-Roman's Mexican lawyer said that, during his ten-year absence from the United States, Cortero-Roman had been incarcerated in

hearing.  Defense counsel said she was there to support Cortero-Roman.  The court asked the Government to speak with her to see if she wanted to address the court.  But she did not.  When Cortero-Roman himself addressed the court, he asked for forgiveness and stated that he feared returning to Mexico.  The Government recommended a fourteen-month sentence of imprisonment, which it thought would "provide adequate deterrence."

The district court disagreed.  It distinguished Cortero-Roman from other undocumented immigrants who come to the States seeking a better life for their families.  The court explained that when those immigrants who are here illegally seek a low sentence, they argue that they aren't "coming over here illegally and committing violent acts against people"—an argument that the court characterized as "pretty effective."  But unlike those immigrants, the court said, Cortero-Roman has a lengthy criminal record and has "been in trouble nonstop since [he] got here."  Indeed, the court said that all Cortero-Roman has done since he arrived in the United States "is commit crimes, crime after crime after crime."

The court then went through Cortero-Roman's criminal history in detail.  And when it got to the recent alleged domestic battery and rape, the district court said it accorded that conduct "the same weight as everything else."  The court then observed that, in

---

Mexico for shooting someone, who then died.  But according to the lawyer, Cortero-Roman was found not guilty of homicide because he acted in self-defense.  The lawyer continued, noting that Cortero-Roman told him he feared for his safety because of this incident.

state court, victims of sexual assault can be subject to a "very invasive" investigation. So it understood why Abassian said that she didn't want to subject herself to that.

And the court compared the circumstances of how Cortero-Roman was found to be here illegally (he was arrested after he allegedly beat up Abassian in front of their son and then raped her) to how others are discovered ("They're riding in the car [as a passenger] with somebody and they get pulled over . . . , or they do a roundup where they just go around and pick people up waiting for work in front of businesses, or someone tells on someone and an otherwise law abiding person that's been here for a long time will be deported.").

After its review of Cortero-Roman's background, the court said that "every red flag is going off here." And it concluded that Cortero-Roman is "a dangerous person" who has "done nothing but commit violent crimes against people." The court added that, in its view, "if" Cortero-Roman was deported, he would "find a way back" because he's returned "several times" before. "[A]nd when you come back in," the court continued, "you're going to do what you've always been doing, commit crimes." Based on these findings, the court announced it was "strongly considering" "giving [Cortero-Roman] ['significantly'] more than the top of the guidelines." But before making its final decision, the court gave Cortero-Roman another month to prepare any additional mitigation evidence he might have.

A month later, the parties reconvened, and defense counsel informed the district court that the State had declined to prosecute the pending state charges against Cortero-Roman. This is all she added in terms of mitigation. For its part, the Government acknowledged that Abassian still had no intentions of prosecuting the alleged domestic battery and rape.

The district court then called Abassian to the stand. The court asked her three questions. First, it confirmed that Abassian "indicated previously" that she wanted the court to show Cortero-Roman leniency, and that he is the father of her child. She agreed to both. Then, the court asked whether Abassian "st[oo]d behind" the domestic-battery-and-rape allegations. She said she did. The court explained that it wasn't trying to criticize or attack Abassian; rather, it "just wanted to hear from" her and "to know what [she was] thinking." Last, the court asked Abassian whether there was "anything else" the court should know before sentencing Cortero-Roman. Abassian asked that the court be lenient and that it not "use" Cortero-Roman's past "against him." Neither Cortero-Roman nor the Government wished to ask Abassian any questions.

The court stated that Abassian's testimony "weigh[ed] heavily" on it, so it ordered a recess to consider the testimony further. When the court reconvened, it said it was going to vary upward from the Guidelines range. The court explained its reasons for doing so. It opined that "[i]t's unfair to say that everyone . . . who has come over here . . . illegally [is] victimizing people, doing bad things, because that's not the case." And then the court went on to

explain that, in its view, Cortero-Roman is not like others with il-legal-reentry cases, who are "trying to honestly make a better way for themselves and their families."

The court observed that Cortero-Roman's criminal history and dangerousness were weighty considerations. It stated that "[t]here has not been a time period in [Cortero-Roman's] adult life where he hasn't been committing crimes, not just crimes but vio-lent crimes."

As to the alleged domestic-battery-and-rape incident that re-sulted in Cortero-Roman's arrest, the court explained that it was "not comforted by the fact that [Abassian was] surrounded by [Cor-tero-Roman's] family"—who, in the court's view, had "probably been lobbying [Abassian] on his behalf." The court said it believed the police report to be "what happened." And it understood Abas-sian's reluctance to press charges. The court said Abassian couldn't "jeopardize . . . [her] child's safety by participating in a prosecution where, when push comes to shove, . . . a prosecutor come[s] to you and say[s], . . . [']they're willing to take a felony battery or whatever to get rid of the case.'" Still, the court said that if it were the pros-ecutor, it "would convince [her] to go forward" because otherwise, she would be "complete[ly] unprotected." The court stated that it "will do everything [it] can to keep [what happened to Abassian] from happening again."

The court sentenced Cortero-Roman to 180 months of im-prisonment. Cortero-Roman objected on substantive-unreasona-bleness grounds alone.

Cortero-Roman appealed. He now argues that the district court violated due process, and that the sentence it imposed was both procedurally and substantively unreasonable.

## II.    DISCUSSION

### A.  *The district court did not commit plain error.*

We first discuss Cortero-Roman's unpreserved arguments that the district court violated due process and that it committed procedural error in the sentencing. We conclude that the court did not depart from neutrality. Nor did the court procedurally err by relying on any clearly erroneous facts in sentencing.

We begin by discussing the standard of review. Cortero-Roman failed to preserve his claims asserting procedural unreasonableness and due-process violations. Because Cortero-Roman did not object to the procedural reasonableness of the sentence, the district court's questioning of Abassian, or any of the statements that the court made at the time, each of these arguments is subject to plain-error review. *See United States v. Al Jaberi*, 97 F.4th 1310, 1327 (11th Cir. 2024).

Plain error requires finding an (1) error, which (2) is plain, and (3) has affected the substantial rights of the defendant. *United States v. Rodriguez*, 627 F.3d 1372, 1380 (11th Cir. 2010). And even if those conditions are met, we reverse "only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Hesser*, 800 F.3d 1310, 1324 (11th Cir. 2015) (per curiam) (cleaned up).

To be "plain," an error must be clear under current law, meaning that the issue has been directly resolved by binding precedent. *United States v. Castro*, 455 F.3d 1249, 1253 (11th Cir. 2006) (per curiam). That means that Cortero-Roman must cite binding precedent that is directly on point to prove his alleged due-process violations. *See Al Jaberi*, 97 F.4th at 1327. The same is true of his procedural-unreasonableness claim. *See id.* As we explain, he failed to meet this standard.

1. The district court did not violate Cortero-Roman's due-process rights by straying from neutrality.

Under the Due Process Clause, a person is "entitle[d] . . . to an impartial and disinterested tribunal in both civil and criminal cases." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). In other words, due process imposes a "neutrality requirement." *Id.*

But establishing a due-process violation isn't easy. "The trial court abuses its discretion only when the judge's conduct strays from neutrality, and even then only when its remarks demonstrate pervasive bias and unfairness that actually prejudice a party." *United States v. Hill*, 643 F.3d 807, 845–46 (11th Cir. 2011) (cleaned up) (citation and internal quotation marks omitted).

We have also expressly recognized that a "trial judge is more than a referee to an adversarial proceeding." *United States v. Harris*, 720 F.2d 1259, 1261 (11th Cir. 1983). Judges may participate in proceedings by, for example, questioning witnesses at trial. *Id.* at

1261–62.  "The judge's participation is limited only by the need to remain impartial."  *Id.* at 1262.

Cortero-Roman argues that the district court violated his due-process rights in three ways:  first, by questioning Abassian as a witness; second, by making "speculative assumptions" based on her testimony; and third, by "assum[ing] the role of a prosecutor." Again, because Cortero-Roman did not object to the district court's questioning of Abassian, or to any of its statements at the time, these arguments are subject to plain-error review.  *See Rodriguez*, 627 F.3d at 1380.  We find no plain error here.

### a.      The court did not err in calling Abassian as a witness and questioning her about her prior allegations.

We begin with Cortero-Roman's first argument.  Cortero-Roman contends that the court violated his due-process rights by calling Abassian as a witness and questioning her about the police report.  Specifically, Cortero-Roman asserts that, in asking Abassian whether she stood by her allegations, the court gave her a "a Hobson's choice"—either to admit she had lied to the police, or to testify against her partner.

This was not error, let alone plain error.  We have never said that a court cannot call its own witness at sentencing.  *Cf.* 18 U.S.C. § 3552 (permitting judges to seek additional information about the defendant if the PSR contains insufficient information).  Indeed, under the Federal Rules of Evidence, a district court may call its own witnesses.  *See* Fed. R. Evid. 614(a) (permitting judges to call their

own witnesses during trial); *United States v. Plasencia*, 886 F.3d 1336, 1343 (11th Cir. 2018) (per curiam) ("[S]entencing procedures are not required to be as exacting as those at trial." (citation omitted)). And Cortero-Roman points to no binding precedent holding that the district court's decision to call and question a witness necessarily amounts to error.

Cortero-Roman's "Hobson's choice" argument also fails. The court called Abassian as a witness in further assessment of Cortero-Roman's character and his conduct while in the United States. The court wanted to know whether, even though the state charges were dropped, she still stood by the allegations in the arrest affidavit.

After all, the domestic battery and rape charges were the reason Cortero-Roman was found and haled into court in the first place. And they were a significant consideration bearing on the sentencing factors in 18 U.S.C. § 3553(a). We have said that district judges have "wide discretion in managing the proceedings," and they may question witnesses and clarify facts previously presented. *United States v. Day*, 405 F.3d 1293, 1297 (11th Cir. 2005) (citation and internal quotation marks omitted). The district court did not act partially by calling Abassian as a witness to assure itself that the facts it relied on in sentencing were accurate. Indeed, Cortero-Roman argued that the dismissal of those charges was a "weighty consideration for the Court." The court did not err in probing the implications of this argument.

The court also offered both parties the opportunity to cross-examine Abassian, which they both declined. And the court asked only three questions. None introduced new evidence against Cortero-Roman. In short, Cortero-Roman's bias argument fails.

### b. The court did not err in making well-founded inferences on the basis of Abassian's testimony.

Next, Cortero-Roman argues that the court used Abassian's testimony to make "speculative assumptions"—namely, that she was being "lobbied and potentially coerced" by Cortero-Roman and his family. The court, he argues, then impermissibly used these "speculative assumptions" to justify an upward variance. Again, we review this argument for plain error because Cortero-Roman did not preserve it in the district court.

This argument is meritless. First, in the interest of accuracy, we note that the court did not announce any affirmative findings that Abassian was "lobbied." To be sure, the court observed that the family of an alleged abuser was surrounding the alleged survivor in the courtroom. And based on its experience, the court suspected that Cortero-Roman's family was "probably" lobbying Abassian. Plus, the court explained that it "suspect[ed] that fear" was motivating Abassian's testimony. But sentencing judges are not required to "ignore what they have learned from similar cases over the years." *United States v. Shaw*, 560 F.3d 1230, 1238 (11th Cir. 2009). And here, the court sufficiently supported its inference

based on its experience and its observation of the witness in the courtroom.

The court also made these comments in the context of explaining why it decided to decline Abassian's request to sentence Cortero-Roman leniently. In other words, the court was explaining its reasons to doubt the credibility of Abassian's statements that Cortero-Roman was, in fact, a "changed man." We generally accord deference to the district court's credibility determinations on appeal. *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002). Not only that, but again, Cortero-Roman points to no binding precedent showing that the court's actions here were error. For these reasons, we reject Cortero-Roman's argument.

### c. The district court did not assume the role of a prosecutor.

Third, Cortero-Roman asserts that the court strayed from neutrality by acting as a prosecutor. He points to the court's comments that it would have encouraged Abassian to go forward with the domestic battery charge had it been the prosecutor. And Cortero-Roman argues that the court ultimately punished him for the domestic battery that the State declined to prosecute.

This argument, too, is unavailing. The court was permitted to take Cortero-Roman's criminal history and future dangerousness into account in sentencing. *See* 18 U.S.C. § 3553(a)(2); *United States v. Smith*, 741 F.3d 1211, 1227 (11th Cir. 2013). Indeed, it was required to do so. The court's consideration of the alleged battery and rape was not error. And though its comments that it would

have "convince[d] [Abassian] to go forward" with the prosecution were not the best practice, these remarks do not rise to the level of a due-process violation. Cortero-Roman has not established that the comments show "pervasive bias and unfairness," nor that he has been "actually prejudice[d]" by them. *See Hill*, 643 F.3d at 846.

In sum, the district court did not act partially or otherwise deprive Cortero-Roman of a fair sentencing proceeding. *See United States v. Wright*, 392 F.3d 1269, 1274 (11th Cir. 2004). To the contrary, the court gave the defense an extra month to prepare a mitigation case. It called Abassian as a witness, knowing she was there on behalf of the defendant, and not knowing what she would say. It gave the parties, including the defense, an opportunity for cross-examination. And it recessed for further deliberation after Abassian testified, to consider more deeply Cortero-Roman's sentence. There was no plain error here.

### 2. The sentence was procedurally reasonable.

While we review a district court's interpretation of the Sentencing Guidelines *de novo*, we review its factual findings for clear error. *United States v. Jordi*, 418 F.3d 1212, 1214 (11th Cir. 2005). The burden is on the party challenging the sentence to prove that the sentence is unreasonable. *United States v. Martin*, 455 F.3d 1227, 1237 (11th Cir. 2006). Because Cortero-Roman did not object at the sentencing on procedural-reasonableness grounds, we review for plain error. *United States v. Vandergrift*, 754 F.3d 1303, 1307 (11th Cir. 2014).

Procedural error may occur if a district court relies on a clearly erroneous fact during sentencing. *See United States v. Gonzalez*, 550 F.3d 1319, 1323 (11th Cir. 2008). A finding of fact may have some "evidence to support it" but still be clearly erroneous. *United States v. Robertson*, 493 F.3d 1322, 1330 (11th Cir. 2007). The test is whether "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (citation and internal quotation marks omitted). And even though clear-error review is deferential, a district court's factual finding still "must be supported by substantial evidence." *Id.*

Cortero-Roman argues that the district court erred by relying on five "unsupported" factual findings in sentencing. He contends that no evidence in the record supported these findings, so the district court erred when it relied on them in sentencing him. We take each alleged error in turn.

First, Cortero-Roman challenges the district court's "finding" that Abassian's testimony was motivated by fear. The court said to Abassian, "[W]hen you were telling me you wanted me to take it easy on him . . . I *suspect* that fear is what has you up here saying what you're saying" (emphasis added). We can't say it was unreasonable for the court to infer, from the factual context, that Abassian's testimony asking for leniency for Cortero-Roman may have been motivated, at least in part, by fear. *See, e.g.*, *United States v. Carthen*, 681 F.3d 94, 103 (2d Cir. 2012) ("Victims of [domestic] violence often are protective of, and deny allegations against, their abusers.").

After all, Abassian's police report, which she stood by, reflected that (1) Cortero-Roman had beaten Abassian on repeated occasions; (2) Cortero-Roman had risked his life, Abassian's life, and their son's life in swerving the car and beating Abassian while she was driving; (3) the presence of their son had not stopped Cortero-Roman from engaging in such behavior; (4) Cortero-Roman had then raped Abassian; and (5) when the police later encountered Abassian, she still had blood on her face and chin from Cortero-Roman's attack. It would be unsurprising for these events to make Abassian fearful of retaliation from Cortero-Roman. And that's especially so, given that the court noted that Abassian said she "did not want to prosecute the defendant for the sexual assault because she didn't want to subject herself to another extensive sex crime investigation."

The court also explained that it drew the inference that Abassian was fearful based in part on its "long history of these types of cases," including the judge's background as a defense attorney, prosecutor, and state-court judge. *See Shaw*, 560 F.3d at 1238 ("There is no requirement that sentencing judges . . . ignore what they have learned from similar cases over the years.").

Cortero-Roman's argument to the contrary is unavailing. He asserts that Abassian's statement that Cortero-Roman was "a changed man" shows that she was motivated not by fear, but by her belief that he had truly changed. That's surely one way for a fact-finder to take the evidence. But it's not the only way. Rather, the evidence allowed for the district court to conclude, as it did,

that Abassian's request for leniency itself may have been motivated by fear.  We generally accord deference to district courts' credibility determinations, *Ramirez-Chilel*, 289 F.3d at 749, and with good reason.  The trial court is "able to observe [the] witness' demeanor and behavior on the witness stand." *United States v. McDonald*, 935 F.2d 1212, 1219 (11th Cir. 1991).  And the record provides no reason to doubt the district court's credibility assessment here.

Second, Cortero-Roman challenges the district court's statement that it believed the defendant's family was "probably" lobbying Abassian on his behalf.  But this statement, too, was a permissible inference for the court to make based on the record and the court's prior experience with similar cases.  *See Shaw*, 560 F.3d at 1238.  And at the end of the day, this statement went to the court's reasonable assessment of Abassian's credibility, which as we've noted, the district court was in the best position to assess.  Again, no plain error occurred.

Third, Cortero-Roman asserts that the district court erred in finding that he "has been committing violent crimes non-stop" as an adult.  The district court said that "[t]here has not been a time period in [Cortero-Roman's] adult life where he hasn't been committing crimes, not just crimes but violent crimes."  The court then reviewed the nine disciplinary infractions that Cortero-Roman incurred while incarcerated for his last illegal-reentry conviction, and it observed that, even as a juvenile, Cortero-Roman was "a confirmed member of the Sur 13 gang."  The court also had previously

reviewed, in detail, Cortero-Roman's long criminal history, which, other than his time in Mexico, was, more or less, uninterrupted.

Cortero-Roman argues that this "finding" is contradicted by the record, which suggests that Cortero-Roman was not convicted of any crimes in the United States during his thirties. That is, of course, true. But it lacks any significance. Cortero-Roman was convicted in 2009 (when he was twenty-nine years old) of illegal reentry and sentenced to thirty months' imprisonment. While incarcerated, Cortero-Roman racked up nine disciplinary infractions, including for threatening bodily harm. Upon his release, he was removed to Mexico. Cortero-Roman then spent the next ten years (the remainder of his thirties after his release following his illegal-reentry imprisonment) in Mexico. So the fact that he had no criminal history in the United States during that period does not show he was law-abiding here.

And still, the PSR shows that Cortero-Roman was convicted on multiple adult criminal counts from ages eighteen through twenty-nine before the alleged domestic battery in March 2022 (at age forty-one) after his illegal return to the United States three months earlier, in December 2021. We have no difficulty concluding that, on this record, the district court's statement about Cortero-Roman's extensive criminal history was not a clearly erroneous finding of fact.

Fourth, Cortero-Roman argues that the court "implicitly found that Mr. Cortero-Roman will be deported" when it stated, "[W]hatever I do here, when you eventually finish your sentence,

if you're not allowed back in, you're just coming back in, and when you come back in, you're going to do what you've always been doing, commit crimes." But the district court was required to consider specific deterrence and to protect against future crimes by the defendant in forming its sentence. 18 U.S.C. § 3553(a). So the facts that Cortero-Roman had been deported three times before, and following each deportation, he eventually illegally reentered and then committed crimes in the United States, were relevant. And in considering specific deterrence, based on Cortero-Roman's track record, the district court's statement was a permissible inference.

At bottom, none of the statements Cortero-Roman challenges are clearly erroneous findings of fact. And Cortero-Roman has failed to show even procedural error (let alone plain error).

Last, we respond to the suggestion in Judge Tjoflat's Concurrence that the district court erred by failing to consider a departure under the Guidelines. We respectfully disagree.

As we've mentioned, neither party here sought a departure. Of course, the district court could have chosen to consider a departure on its own. But under the post-*Booker* Guidelines, it was not required to do so. After all, the Guidelines provide that "[w]hen a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court *may* consider whether a departure is warranted." U.S.S.G. ch. 1 pt. A, intro. comment. 4(b) (Nov. 2018) (emphasis added).

Before *Booker*, a departure was the only way that a court could account for such issues. But after *Booker*, a court may apply a variance instead or in addition to a departure. *See, e.g.*, *United States v. Diosdado-Star*, 630 F.3d 359, 365 (4th Cir. 2011) (observing that "the practical effects of applying either a departure or a variance are the same"").

As we've explained, though, the court must adequately explain the basis for its variance if it chooses to go that route. But we aren't aware of any cases suggesting that, post-*Booker*, a district court must consider whether a departure is warranted before imposing a variance instead.[7] *Cf. id.* ("[T]he method[, i.e., a departure or a variance,] by which the district court deviates from the Guidelines range does not alter (1) the review in which the courts of appeals must engage, or (2) the justification the district court must provide."); *id.* at 366 (rejecting the argument that the district court must consider whether a departure is appropriate before imposing a variance).

And this makes good sense. As we recently explained in *Olson*, it doesn't always matter whether the district court imposed a departure or a variance. *See United States v. Olson*, 127 F.4th 1266, 1274–76 (11th Cir. 2025). It would matter if, for example, we faced a procedural challenge to the court's sentence on notice grounds.

---

[7] Of course, if the district court suggested it thought itself powerless to consider a departure, that might raise a different issue. But that's not the case here.

*See United States v. Hall*, 965 F.3d 1281, 1295–96 (11th Cir. 2020). Departures, after all, require notice.

But sometimes, like here, whether the court imposes a departure or a variance doesn't make a difference because it doesn't affect the outcome. *See Olson*, 127 F.3d at 1274–75 (collecting cases). That's so because of the harmless-error doctrine. If the district court would reach the same sentence by applying a departure or a variance, and the court applied a variance, then we need not address which path it did take (as in *Olson*) or "should have" taken (as Judge Tjoflat's Concurrence contends). And that's especially so when, as here, the district court recessed for a month to allow Cortero-Roman a chance to develop a strategy for responding to the district court's concerns that it suggested it would account for in sentencing (and Cortero-Roman doesn't challenge his sentence on the basis that he didn't receive fair notice). So in other words, no real difference existed procedurally here between proceeding under a departure and proceeding under a variance. Plus, it'd be futile, as a practical matter, to require the district court to run through the list of potential departures under the Guidelines, if—even in the absence of any applicable departure—the district court would've imposed a variance resulting in the same sentence, anyway. *See, e.g.*, *Olson*, 127 F.3d at 1274–76; *United States v. Livesay*, 525 F.3d 1081, 1092 (11th Cir. 2008).

For these reasons, we find no procedural error here.

B. *We cannot evaluate the substantive reasonableness of the sentence because the district court did not sufficiently explain the basis for its decision so as to allow meaningful review.*

Next, we address Cortero-Roman's preserved argument that the district court's sentence was substantively unreasonable. We agree with the district court's assessment that the facts here justified an upward variance. But we are unable to assess the reasonableness of the upward variance the district court imposed here because the district court did not sufficiently explain the basis for the extreme degree of variance from the Guidelines.

We begin with the standard of review. We review the substantive reasonableness of a sentence for abuse of discretion. *United States v. Irey*, 612 F.3d 1160, 1188–89 (11th Cir. 2010) (en banc). "That familiar standard 'allows a range of choice for the district court, so long as that choice does not constitute a clear error of judgment.'" *Id.* at 1189 (quoting *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc)). And the burden falls on the party challenging the sentence to prove that it's unreasonable. *Martin*, 455 F.3d at 1237.

Abuse of discretion occurs when a district court "(1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *Irey*, 612 F.3d at 1189 (quoting *United States v. Campa*, 459 F.3d 1121, 1174 (11th Cir. 2006) (en banc)). In other words, "[e]ven though not bound by the [G]uidelines, a sentencing

court may not give them so little consideration that it amounts to 'not giv[ing] any real weight to the Guidelines range in imposing the sentence.'" *Id.* at 1217 (citation omitted). Though district courts have discretion in sentencing, "that [discretionary] zone is neither limitless nor impervious to review." *Id.* at 1191 n.16. We may vacate the sentence if we are "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the [18 U.S.C.] § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *Id.* at 1190 (quoting *United States v. Pugh*, 515 F.3d 1179, 1191 (11th Cir. 2008)).

Section 3553(a) provides that the "court shall impose a sentence *sufficient, but not greater than necessary*, to comply with the purposes set forth" in Section 3553(a)(2). 18 U.S.C. § 3553(a) (emphasis added). Those purposes include the need for the sentence to reflect the offense's seriousness and to provide just punishment for it, to provide adequate deterrence, to protect the public from any future crimes of the defendant, and to provide the defendant with adequate training or correctional treatment. *Id.* § 3553(a)(2).

The other factors in Section 3553(a) that the court must consider include the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentence and sentencing range set forth by the Sentencing Guidelines, and the need to avoid unwarranted sentence disparities among similarly situated defendants. *Id.* § 3553(a). The district court must evaluate all the Section 3553(a) factors, but the weight given to each factor

is within "the sound discretion of the district court." *United States v. Ramirez-Gonzalez*, 755 F.3d 1267, 1272–73 (11th Cir. 2014) (per curiam) (citation and internal quotation marks omitted).

In considering whether a particular sentence imposed is reasonable, we must "take into account the totality of the circumstances, including the extent of any variance from the Guidelines range," *Gall v. United States*, 552 U.S. 38, 51 (2007), which "is surely relevant" to the reasonableness inquiry, *id.* at 41.

The problem here is that, while we understand why the district court thought it appropriate to upwardly vary from the Sentencing Guidelines, the district court did not explain how it arrived at its 166-month, or 1,186%, upward variance.[8]  As a percentage, this variance is (by far) the most extreme we've encountered. *See, e.g.*, *United States v. Overstreet*, 713 F.3d 627, 639–40 (11th Cir. 2013) (affirming an upward variance of twice as much as the upper end of the Guidelines range, in a felon-in-possession-of-firearm case where the defendant had been convicted of multiple burglaries, two attempted murders, and an aggravated sexual assault, and where the district court found he had murdered his wife).  Even in absolute terms, we've acknowledged that a "variance of *60 months* above the advisory guidelines range was a major one." *United States v. Rosales-Bruno*, 789 F.3d 1249, 1256 (11th Cir. 2015)

---

[8] Because Cortero-Roman was sentenced to 180 months, where the top end of the Guidelines range was fourteen months, the district court varied above the high-end of the range by 166 months—an 1,186% increase (180-14)/14=11.8561).

28                    Opinion of the Court                  22-13930

(emphasis added).  Yet the district court did not show "that the [Guidelines range] [was] taken into account," *see United States v. Johnson*, 877 F.3d 993, 997 (11th Cir. 2017) (per curiam), in arriving at the variance.

To be sure, the district court expressed its concern about Cortero-Roman's criminal history, his dangerousness to the public and especially to Abassian and their son, and his recidivism risk. And we agree that, on this record, these concerns were justified and significant.  But the district court never explained how these concerns warranted the extreme variance from the Guidelines range here.  Perhaps they do.  But we don't know because the district court didn't explain its thinking.[9]  As a result, we can't engage in "meaningful appellate review" of its sentence.  *See United States v. Cook*, 998 F.3d 1180, 1185 (11th Cir. 2021).

We've vacated sentences on substantive-reasonableness grounds before because the district court did not adequately explain its reasoning.  *See, e.g., Pugh*, 515 F.3d at 1182 (finding that "the district court did not provide a sufficiently compelling justification to support the degree of its variance"); *United States v. Valdes*, 500 F.3d 1291, 1292 (11th Cir. 2007) (per curiam) (vacating and

---

[9] For example, perhaps the district court thought the criminal-history points calculation was misleading on this record.  Still, it did not explain how after calculating Cortero-Roman's criminal-history category as II and the Guidelines range (accordingly) as eight to fourteen months, it then sentenced him to 166 months above the high end of that range.

remanding "because this record is insufficient to permit the affirmance of the sentence"). And we conclude we must do so here.

In short, the district court cannot just calculate and announce the Guidelines range and then ignore it in imposing whatever sentence it pleases. It must relate the sentence it chooses to the Guidelines range and explain not only why a variance is warranted but also—especially in a case like this one where the variance is so extreme—how it arrived at the extent of the variance. Because the district court did not do that here, we can't evaluate the substantive reasonableness of the sentence. And we must vacate the sentence and remand for the district court to engage in further consideration of its sentence and explanation. Only once it does that can we conduct meaningful appellate review.

### C. Reassignment on remand is not warranted.

We do not reassign this case to a different judge on remand. Though we have the authority to do so, "[r]eassignment is an extraordinary order, and we do not order it lightly." *United States v. Gupta*, 572 F.3d 878, 891 (11th Cir. 2009) (cleaned up) (citation omitted). "Reassignment is appropriate where the trial judge has engaged in conduct that gives rise to the appearance of impropriety or a lack of impartiality in the mind of a reasonable member of the public." *United States v. Torkington*, 874 F.2d 1441, 1446 (11th Cir. 1989) (per curiam).

More specifically, when there's no indication of actual bias on the original judge's part, we consider at least three factors to determine if the case should be reassigned: "(1) whether the

original judge would have difficulty putting his previous views and findings aside; (2) whether reassignment is appropriate to preserve the appearance of justice; [and] (3) whether reassignment would entail waste and duplication out of proportion to gains realized from reassignment." *Id.* at 1447.

Reassignment is not warranted here. There is nothing to suggest that the district court lacks impartiality or would have any difficulty putting its previous findings aside. To the contrary, the court allowed defense counsel the benefit of two sentencing hearings, spaced a month apart, to ensure fair proceedings. Between each hearing, it offered Cortero-Roman the opportunity to gather further mitigating evidence. And it explained its reasoning (though inadequately) on the record.

Cortero-Roman's arguments to the contrary are unavailing. He argues that reassignment is necessary because the district judge made factual findings that the record didn't support. As explained above, that is wrong. And the judge has not impermissibly created an appearance of partiality through his comments, either. Plus, the waste and duplication incurred by reassignment would outweigh any gains potentially realized by it. *See id.*

In sum, Cortero-Roman has not shown that the district judge would be partial or unfair on remand, nor that there would be an impermissible appearance of impropriety.

### III.    CONCLUSION

We conclude that the district court did not violate Cortero-Roman's due-process rights, nor did it commit plain procedural

error in the sentencing.  But we cannot engage in meaningful review of the sentence's substantive reasonableness on this record. So we vacate the sentence and remand to the district court for further consideration and explanation.

**VACATED AND REMANDED.**

22-13930          TJOFLAT, J., Specially Concurring          1

TJOFLAT, Circuit Judge, specially concurring:

I agree with the Court's decision to vacate Cortero-Roman's sentence, but I part ways with its finding of procedural reasonableness. The District Court's approach was not reasonable—it was flawed. Rather than considering an upward *departure* under the Sentencing Guidelines, the District Court skipped straight to an upward *variance*. That shortcut undermined the Guidelines' role as the "starting point and the initial benchmark" for federal sentencing. *See Gall v. United States*, 552 U.S. 38, 49, 128 S. Ct. 586, 596 (2007). While *United States v. Booker*[1] made the Guidelines advisory, it did not render them optional. District courts must still begin all sentencing proceedings by correctly calculating the applicable Guidelines range. *Id.*; *United States v. Crawford*, 407 F.3d 1174, 1178–79 (11th Cir. 2005) (noting that the failure to calculate the correct Guidelines range is procedural error); 18 U.S.C. § 3553(a)(4) (directing sentencing courts to consult the Sentencing Guidelines).

This case presents at least two grounds for deviating from the Guidelines range that warranted formal consideration: (1) Cortero-Roman's unlawful presence in the United States facilitated a violent crime—conduct far outside the heartland of an ordinary illegal reentry case; and (2) the 2016 amendment to the Sentencing Guideline for illegal reentry created a gap that allowed Cortero-Roman's prior aggravated felonies to escape meaningful enhancement. These grounds were central to the sentencing calculus. By

---

[1] 543 U.S. 220, 125 S. Ct. 738 (2005).

bypassing the departure analysis, the District Court failed to properly anchor its sentence in the Guidelines' structured framework.

## I. A PRIMER ON SENTENCING

To appreciate the District Court's missteps, it is essential to first review the Sentencing Guidelines' history.

### A.  The Early Days

Colonial courts had based sentencing on three principles: punishment, general deterrence, and incapacitation (also known as specific deterrence). *See United States v. Scroggins*, 880 F.2d 1204, 1206 (11th Cir. 1989). The advent of the American prison system in the 1800s added a fourth purpose—rehabilitation—which judges and penal experts deemed central to sentencing based on the hope that prisoners could be "cured" of criminal tendencies and reintegrated into society. *Id.* at 1206–07.

Under this "medical model," district courts imposed indeterminate sentences with a minimum and maximum term, delegating to the Parole Board the determination of when an offender was ready for release. *Id.* at 1207. The Parole Board had broad authority to recalibrate sentencing terms within this range, evaluating an offender's rehabilitation progress. *Id.* This structure empowered the Parole Board in the sentencing landscape. *Id.*

Courts of appeals, however, had virtually no role in overseeing sentencing unless the district court imposed an illegal sentence that exceeded the statutory maximum. *See United States v. Irey*, 612

22-13930            TJOFLAT, J., Specially Concurring            3

F.3d 1160, 1228 (11th Cir. 2010) (Tjoflat, J., specially concurring in part and dissenting in part) (citing *Koon v. United States*, 518 U.S. 81, 96, 116 S. Ct. 2035, 2045 (1996)). So, appellate review was limited, which led to opaque sentencing records that offered little insight into how sentencing decisions were reached. *Id.*

By the 1960s, the medical model faced mounting criticism. *Scroggins*, 880 F.2d at 1207. Congress, concerned that rehabilitative theories often yielded disparate and unpredictable terms of incarceration, rejected the notion that prison could reliably rehabilitate offenders. *Id.* And the Parole Board proved incapable of determining recidivism for purposes of incapacitation. *Id.* Widely differing maximum terms of imprisonment for similar crimes underscored the model's inherent inequities, as district courts retained unfettered discretion and the Parole Board wielded immense influence. *Irey*, 612 F.3d at 1228 (Tjoflat, J., specially concurring in part and dissenting in part). Reports from the Brown Commission[2] and the General Accounting Office highlighted the pressing need for transparency and consistency in sentencing. *See* Gerald Bard Tjoflat, *The Evolution of the Federal Criminal Sentencing System*, 13 Am. Univ. Int'l L. Rev. 1077, 1079–81 (1998). Congressional initiatives aimed at reform gained momentum, culminating in the passage of the Sentencing Reform Act of 1984 (SRA). *See Scroggins*, 880 F.2d at 1207;

---

[2] The Brown Commission was established in the late 1960s to study federal criminal code revision. Chaired by former California Governor Pat Brown, the Commission issued a comprehensive report that called for the reform of the substantive criminal law and sentencing.

Sentencing Reform Act of 1984, Pub. L. No. 98-473, § 211, 98 Stat. 1987.

The SRA represented a fundamental shift in sentencing. Congress established the United States Sentencing Commission and tasked it with creating guidelines to address the medical model's disparities by standardizing sentencing practices. *See Scroggins*, 880 F.2d at 1208; *see also* 28 U.S.C. § 994(k). Unlike the medical model's indeterminate sentences, the SRA required determinate sentencing, abolished parole, and established clear, measurable sentencing criteria. *Scroggins*, 880 F.2d at 1208. And in furtherance of its transparency objective, the SRA also provided both defendants and the government the right to appeal sentences. *See Irey,* 612 F.3d at 1234–35 (Tjoflat, J., specially concurring in part and dissenting in part).

### B.  United States v. Booker

The Sentencing Guidelines promulgated by the Sentencing Commission were initially mandatory, locking sentences within narrow bands to prevent unwarranted disparities. But in *United States v. Booker*, the Supreme Court held that the mandatory nature of the Guidelines violated the Sixth Amendment, turning them into advisory guidelines. 543 U.S. at 245, 125 S. Ct. at 757. But this ruling, while transformative, did not eradicate the Guidelines' role as the "starting point and the initial benchmark" for sentencing. *Gall*, 552 U.S. at 49, 128 S. Ct. at 596. In other words, "[t]he *Booker* remedy, while not the system Congress enacted, was designed to continue to move sentencing in Congress' preferred direction, helping

22-13930          TJOFLAT, J., Specially Concurring          5

to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary." *Peugh v. United States*, 569 U.S. 530, 536, 133 S. Ct. 2072, 2080 (2013) (citation and internal quotation marks omitted).

Post-*Booker*, the Supreme Court has made clear how sentencing operates: "First, 'a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.'" *Id.* at 536, 133 S. Ct. at 2080 (quoting *Gall*, 552 U.S. at 49, 128 S. Ct. at 590). "The district court must then consider the arguments of the parties and the factors set forth in § 3553(a)." *Id.* (citing *Gall*, 552 U.S. at 49–50, 128 S. Ct. at 596).

And the Supreme Court also clarified that *Booker* still requires appellate courts to "review [a sentence] for unreasonableness." *Booker*, 543 U.S. at 264, 125 S. Ct. at 767; *see also Peugh*, 569 U.S. at 537, 133 S. Ct. at 2080. Part of that reasonableness requires a district court "to calculate *correctly* the sentencing range prescribed by the Guidelines." *Crawford*, 407 F.3d at 1178. "Failure to calculate the correct guidelines range constitutes procedural error." *Peugh*, 569 U.S. at 537, 133 S. Ct. at 2081 (citing *Gall*, 552 at 51, 128 S. Ct. at 597). And that correct calculation includes a district court's imposition (or lack thereof) of an upward departure. *See United States v. Ellis*, 419 F.3d 1189, 1193 (11th Cir. 2005); *United States v. Jordi*, 418 F.3d 1212, 1215 (11th Cir. 2005).

Our Circuit quickly adopted this understanding of *Booker*'s impact. In what we label the "consultation requirement," we have consistently held that a district court must "calculate *correctly* the sentencing range prescribed by the Guidelines." *Crawford*, 407 F.3d at 1178. "In other words, as was the case before *Booker*, the district court must calculate the Guidelines range accurately. A misinterpretation of the Guidelines by a district court 'effectively means that [the district court] has not properly consulted the Guidelines . . . .'" *Id.* at 1179 (quoting *United States v. Hazelwood*, 398 F.3d 792, 801 (6th Cir. 2005)).

In the end, the Guidelines framework ensures district courts begin with a consistent baseline and only deviate when a defendant's individual circumstances justify doing so.

### C.  *Departures vs. Variances*

Building off this framework, there are two distinct mechanisms for deviating from the Guidelines range: **departures** and **variances**. Understanding the difference between them is essential to maintaining the structured discretion the Guidelines implement.

### 1.  Departures

"'Departure' is a term of art under the Guidelines and refers only to non-Guidelines sentences imposed under the framework set out in the Guidelines." *Irizarry v. United States*, 553 U.S. 708, 714, 128 S. Ct. 2198, 2202 (2008); *accord United States v. Olson*, No. 23-11939, 2025 WL 364602 at *5 (11th Cir. Feb. 3, 2025) ("[W]hen the court departs from a guidelines range sentence, it relies on the departure provisions in the guidelines." (citation omitted)).

22-13930            TJOFLAT, J., Specially Concurring            7

A departure accounts for factors the Sentencing Commission either did not consider or did not adequately address.[3] Indeed, the Guidelines explicitly instruct that "[w]hen a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." U.S.S.G. ch. 1, pt. A.4(b).

For example, § 5K2.0 of the Guidelines explicitly allows a court to depart when the applicable base offense level does not adequately reflect the seriousness of the offense. *See id.* § 5K2.0(a)(1)(A). Similarly, § 5K2.21 allows a court to depart upward because of conduct underlying a charge that was dismissed or

---

[3] The statutory foundation for the Guidelines (and therefor departures) stems from 28 U.S.C. § 994, which directs the Sentencing Commission to consider specific factors in establishing the Guidelines. These include "the nature and degree of the harm caused by the offense" (§ 994(c)(3)), "the community view of the gravity of the offense" (§ 994(c)(4)), and "the public concern generated by the offense" (§ 994(c)(5)).

Importantly, though Congress made clear that "[t]he Commission shall insure that the guidelines reflect the inappropriateness of imposing a sentence to a term of imprisonment for the purpose of rehabilitating the defendant." 28 U.S.C. § 994(k). This directive highlights a structural difference between a departure and a variance. A departure operates within the Guidelines framework, recalibrating the range to account for unanticipated or inadequately captured factors. A variance, by contrast, flows from the broader § 3553(a) factors, which, unlike the grounds for departures, can include rehabilitation. *See* 18 U.S.C. § 3553(a)(2)(D) (listing "needed educational or vocational training, medical care, or other correctional treatment" as a consideration when imposing a sentence).

not pursued. *Id.* § 5K2.21 These provisions allow sentencing courts to recalibrate the Guidelines range when extraordinary facts place an offense outside the "heartland" of cases anticipated by the Guidelines. *Id.* ch. 1, pt. A.4(b).

But this adjustment comes with rules. A departure requires explicit written findings explaining why the base Guidelines range fails to fulfill the goals of sentencing. *See, e.g.*, *United States v. Sammour*, 816 F.3d 1328, 1341–42 (11th Cir. 2016) (describing the "step-by-step procedure" that a district court must use when imposing an upward departure).

## 2. Variances

A variance, by contrast, is not grounded in the Guidelines but is instead based on the broader statutory factors enumerated in 18 U.S.C. § 3553(a).[4] "[W]hen a district court determines that a guidelines sentence will not adequately further the purposes reflected in 18 U.S.C. § 3553(a), it may vary from the guidelines range and impose a higher or lower sentence.  That's a variance." *Olson*, 2025 WL 364602 at *5 (citations and internal quotation marks omitted).

Said differently, a variance is an extra layer of discretion that allows a sentencing court to tailor a sentence to the holistic context of a case. But that extra discretion comes into play only after an

---

[4] Recall that these factors—such as the need for punishment, general deterrence, and specific deterrence—were used by the Sentencing Commission to draft the Guidelines. *See* 28 U.S.C. § 994(a)(2), (g).

accurate Guidelines range is calculated, including evaluating the need for departures. As we have explained:

> The Guidelines Manual provides instruction on how its provisions are to be applied. The last step in the application instructions of the guidelines states: "Refer to Parts H and K of Chapter Five, Specific Offender Characteristics and Departures, and to any other policy statements or commentary in the guidelines that might warrant consideration in imposing sentence." U.S.S.G. § 1B1.1(i). Therefore, *the application of the guidelines is not complete until the departures, if any, that are warranted are appropriately considered*.

*Jordi*, 418 F.3d at 1215 (emphasis added).[5]

    3.  Consequences of Conflating Departures and Variances

The omission of a formal departure analysis has significant implications for the transparency, fairness, and reviewability of a sentence.

First, the failure to consider an upward departure distorts the purpose of the Guidelines, which requires a calibrated baseline.

---

[5] The Majority has seemingly lost sight of this precedent and mistakenly conflated departures and variances. *See* Maj. Op. at 23–24. But departures and variances are not interchangeable. *See Irizarry*, 553 U.S. at 714, 128 S. Ct. at 2202. Departures are integral to the Guidelines calculation, while variances are independent deviations outside of the Guidelines. Because 18 U.S.C. § 3553(a) and Supreme Court precedent require courts to calculate a Guidelines range first, the sequence for deviating from a Guidelines sentence is straightforward:

10                    TJOFLAT, J., Specially Concurring              22-13930

Failing to recalibrate a defendant's sentence through a departure undercuts the Guidelines' goal of ensuring that similar cases are sentenced similarly.[6] In other words, "[w]ithout the correct guideline range, the court varies from the wrong point." *United States v. Gutierrez-Hernandez*, 581 F.3d 251, 256 (5th Cir. 2009).

Furthermore, omitting a documented departure undermines the fairness of the sentence itself. The Guidelines establish a structure in which departures must be substantiated by specific findings, ensuring that any recalibration of the Guidelines range is justified. Without this documentation, the reasoning behind a

---

departures come first *as part of the Guidelines calculation. See Jordi*, 418 F.3d at 1215. Only after this step can a court consider a variance.

The Guidelines' use of "may" to describe departures in "atypical cases" does not change this required sequence. *But see* Maj. Op. at 23. "[M]ay" simply highlights that courts have discretion to deviate from the base Guidelines sentence when warranted—they can accept the base Guidelines sentence, but they are not bound to do so. Still, that discretion follows an order of operations: a court must address departures within the Guidelines framework before considering variances outside it.

Here, the District Court's extreme upward deviation confirms that it found Cortero-Roman's base Guidelines sentence inadequate. Yet it bypassed the departure analysis all together. That is error.

[6] The Sentencing Guidelines provide a point of reference that allows both the courts and the defendant to understand what portion of the sentence reflects the need for punishment, general deterrence, and the protection of the public. By calculating an accurate offense level, we can maintain the Guidelines' goal of predictable and reviewable sentences, grounded in clear rationale for each departure or variance. *See* U.S.S.G. § 1A1.3 (outlining the purpose of the Guidelines as fostering transparency and consistency in sentencing).

22-13930          TJOFLAT, J., Specially Concurring          11

sentence becomes opaque, leaving defendants without a clear understanding of why certain deviations were made.

Bypassing the departure analysis also erodes the ability of appellate courts to meaningfully review a sentence. The structure provided by the Guidelines is designed to offer a clear, reviewable framework, ensuring that each step of the sentencing process can be examined for procedural correctness and fairness. A documented departure, backed by specific findings, provides a concrete basis for appellate review. When a court skips this step, however, it leaves an incomplete record that lacks the transparency necessary for review.[7]

If an appellate court affirms in a case with a deficient Guidelines calculation, it effectively vacates the district court's sentence in practice, as it substitutes its review for the required recalibration at the trial level. Such affirmance encourages district courts to shortcut the Guidelines process, knowing that any lapse may later be corrected on appeal. This approach distorts the intended roles of trial and appellate courts under the SRA by shifting structured sentencing duties onto appellate review. *See Irey*, 612 F.3d at 1226 (Tjoflat, J., specially concurring in part and dissenting in part) ("Resentencing defendants on appeal does immense harm to this court's institutional relationship with the district courts by transforming the district court's sentencing proceeding from the 'main

---

[7] This is why we are forced to vacate Cortero-Roman's sentence—because "we cannot engage in meaningful review of the sentence's substantive reasonableness on this record." *See* Maj. Op. at 31.

event' to a 'tryout on the road.' This, in turn, creates perverse incentives for the parties and the district court, misallocates judicial resources, and creates disrespect for the rule of law.").

## II. CORTERO-ROMAN'S REENTRY CONDUCT

With that context, I turn to the first issue at hand: how should a district court sentence an offender whose illegal presence in the United States facilitated a violent crime? Congress, after all, directs the Sentencing Commission to consider "the nature and degree of harm caused by the offense" when establishing a Guidelines range. 28 U.S.C. § 994(c)(3). Here, Cortero-Roman was arrested for illegal reentry after battering and raping Jennifer Abassian, the mother of his child. This conduct falls far outside the typical illegal reentry case. The District Court should have addressed this deviation by using the departure provisions outlined in the Guidelines.

### A.  The Nature of Illegal Reentry

To understand the gravity of this error, we must first examine the nature of illegal reentry as an ongoing offense. **Section** 1326 makes it a crime for any alien who has been previously deported or removed to "enter[], attempt[] to enter, or [be] at any time found in, the United States" without authorization. 8 U.S.C. § 1326(a)(2). In other words, illegal reentry is not an isolated act. "Where a deported alien enters the United States and remains here with the knowledge that his entry is illegal, his remaining here until he is 'found' is a continuing offense because it is 'an unlawful act set on foot by a single impulse and operated by an unintermittent force.'" *United States v. Santana-Castellano*, 74 F.3d 593, 598 (5th Cir. 1996)

22-13930          TJOFLAT, J., Specially Concurring          13

(quoting *United States v. Midstate Horticultural Co.*, 306 U.S. 161, 166, 59 S. Ct. 412, 414 (1939)); *see also United States v. Are*, 498 F.3d 460, 462 (7th Cir. 2007) ("The 'found in' variation of the § 1326(a)(2) crime is a continuing offense. . . .").[8]

The law thus distinguishes illegal reentry from discrete criminal acts; the offense is ongoing and encompasses the period of the defendant's unlawful presence in the country. As a result, conduct occurring during that period—including the very events that bring the defendant's presence to the government's attention—can and should inform the sentencing court's assessment of the offense's seriousness and the defendant's recidivism risk.

Here, Cortero-Roman's rape and battery of Ms. Abassian occurred while he was committing the federal crime of unlawful reentry. His continued presence was not just incidental to the harm; it was a precondition for it. "After all, the domestic battery and rape charges were the reason Cortero-Roman was found and haled into court in the first place." Maj. Op. at 14.

### B. *Sentencing Extraordinary Conduct*

The Sentencing Commission is explicit that it "intends the sentencing courts to treat each guideline as carving out a

---

[8] Some courts have found that illegal reentry was not a continuing offense sufficient to extend the statute of limitations after a defendant was taken into custody. *See, e.g.*, *United States v. Rivera-Ventura*, 72 F.3d 277, 281 (2d Cir. 1995). Regardless of what we may hold in a future case where the issue is properly before us, my point here is that Cortero-Roman committed the battery and rape while also committing the crime of being in the United States illegally.

14                    TJOFLAT, J., Specially Concurring            22-13930

'heartland,' a set of typical cases embodying the conduct that each guideline describes."[9] U.S.S.G. ch. 1, pt. A.4(b). And so, the Guidelines under § 2L1.2 assumes a typical reentry case: an offender unlawfully enters or remains in the country and is apprehended without committing new violent acts. True, the Guidelines enhance the base offense level for prior convictions. U.S.S.G. §2L1.2(b). But it says nothing about violent crimes committed *during* the reentry offense itself. A violent crime like rape fundamentally alters the nature of illegal reentry. The offender's presence—the very essence of the § 1326 violation—becomes a vehicle for harm far more egregious than what the Guidelines envision. *See* U.S.S.G. § 1B1.3(a)(3) (listing "all harm that resulted from the acts and omissions" of the criminal offense as "relevant conduct").

The Guidelines anticipate situations like this—cases where extraordinary conduct aggravates the offense but is not reflected in the standard calculations.[10] Section 5K2.21 allows a court to depart upward based on conduct relating to a crime that was not prosecuted. Similarly, § 5K2.0 allows departures when the Guideline offense level for the crime inadequately reflects the seriousness of the offense. So, while Cortero-Roman is not being tried or sentenced

---

[9] This is because, as the Guidelines acknowledge, "it is difficult to prescribe a single set of guidelines that encompasses the vast range of human conduct potentially relevant to sentencing decisions." U.S.S.G. ch. 1, pt. A.(4)(b).

[10] The District Court was clear that "Cortero-Roman is not like others with illegal-reentry cases, who are 'trying to honestly make a better way for themselves and their families.'" *See* Maj. Op. at 10.

22-13930          TJOFLAT, J., Specially Concurring          15

for rape or domestic battery here, the District Court can properly consider those acts when imposing a sentence.[11]

To properly impose a sentence in a situation like this, the District Court must first consider the actual circumstances of the offense. In particular: *What harm occurred during the offense of unlawful reentry, and how does that harm compare to sentences for similar conduct?* And in assessing the harm caused by Cortero-Roman's illegal reentry, the District Court should look to the Guidelines ranges for analogous crimes—such as rape under § 2A3.1[12]—as a benchmark for Cortero-Roman's post-reentry conduct. While these offenses may not be the subject of the conviction, their severity underscores the broader harm inflicted from the offense that is being sentenced.

Here, though, the District Court failed to use these tools. It imposed an upward variance but did so without explaining its reasoning or connecting the sentence to the specific harm caused by Cortero-Roman's conduct. That approach sidesteps the structured

---

[11] The state's decision to drop Cortero-Roman's rape charge did not sever this conduct from sentencing consideration. Courts can consider that sort of uncharged or dismissed conduct at sentencing. *See United States v. Watts*, 519 U.S. 148, 151–57, 117 S. Ct. 633, 635–38 (1997); *United States v. Belfast*, 611 F.3d 783, 827 (11th Cir. 2010).

[12] Federal criminal sexual abuse under 18 U.S.C. § 2242 carries a base offense level of 30. While Cortero-Roman's conduct lacks the jurisdictional elements necessary to sustain a federal charge, the District Court may look to the corresponding Guidelines range of 108–135 months (assuming a Criminal History Category II) as illustrative of the gravity and broader harms caused by the offense. This range provides a helpful benchmark for assessing the seriousness of the conduct underlying the reentry.

analysis the Guidelines require and risks obscuring the justification for the sentence.

In the end, departures exist for a reason: to fill the gaps where the Sentencing Commission fell short. District courts should use them when a defendant's conduct, like Cortero-Roman's, far exceeds the heartland of the offense. The circumstances here—rape, battery, and the continuing violation of § 1326—demand no less.

### III. CORTERO-ROMAN'S PRIOR AGGRAVATED FELONIES

The District Court's failure to consider an upward departure is even more troubling given a second problem: the disconnect between Congress's treatment of illegal reentry after an aggravated felony and the current Sentencing Guidelines. Congress has long viewed reentry following an aggravated felony as a far more serious offense, one deserving significantly harsher punishment.[13] For decades, the Guidelines reflected that statutory judgment by mandating a sixteen-point enhancement to the base offense level. But the Sentencing Commission's 2016 amendments to § 2L1.2 got rid of that enhancement, and in so doing created a gap—one that allowed Cortero-Roman's prior aggravated felonies to fall through

---

[13] So much more severe that Justices Scalia, Stevens, Souter, and Ginsburg were convinced that "[i]llegal reentry *simpliciter* (§ 1326(a)) and illegal reentry after conviction of an aggravated felony (§ 1326(b)(2)) are separate criminal offenses." *Almendarez-Torres v. United States*, 523 U.S. 224, 249, 118 S. Ct. 1219, 1233–34 (1998) (Scalia, J., dissenting).

22-13930            TJOFLAT, J., Specially Concurring            17

the cracks. The District Court should have accounted for that gap through a departure.

\*        \*        \*

Under 8 U.S.C. § 1326, Congress set the statutory maximum sentence for illegal reentry at two years. But in 1988, Congress raised the maximum to fifteen years for offenders whose reentry followed a prior aggravated felony. In 1996, Congress increased it further to twenty years. Congress's decision reflected a clear judgment about recidivism. *See Almendarez-Torres*, 523 U.S. at 226, 118 S. Ct. at 1222 ("We conclude that [§ 1326(b)] . . . authorizes a court to increase the sentence for a recidivist.") In simpler terms, Congress decided that those who have reentered the United States unlawfully after having already been convicted of an aggravated felony are not like other defendants; they deserve substantially more punishment and thus their base offense level must be increased accordingly. *Cf.* 18 U.S.C. § 3553(a)(2)(A) (directing courts to consider the need for a sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense").

For decades, the Sentencing Guidelines tracked that judgment. Before 2016, a defendant with a prior aggravated felony received an automatic 16-level enhancement to his base offense level under § 2L1.2. That enhancement aligned sentences for illegal reentry with Congress's statutory framework, ensuring that sentencing courts treated reentry following an aggravated felony as something categorically different.

That alignment has all but disappeared. In 2016, the Sentencing Commission created Amendment 802 to revise § 2L1.2 so that the focus is on the *length* of the prior sentence rather than the *nature* of the prior conviction. After Amendment 802, a prior conviction with a sentence of five years or more results in a 10-level increase to the base offense level. Sentences between two and five years trigger an 8-level increase to the base offense level. Sentences between one year and a month to two years trigger a 6-level increase to the base offense level. And a conviction for any other felony offense triggers a 4-level increase to the base offense level. The revised Guidelines also include a temporal limitation, meaning that only prior convictions that fall within the time frames used for criminal history calculations under § 4A1.2(e) are counted for purposes of enhancing the base offense level.[14]

That shift can create a problem in a case like this. By abandoning the categorical 16-level enhancement to the base offense level, Amendment 802 severs the connection between Congress's judgment about aggravated felonies and the sentences imposed for illegal reentry. In cases where either the prior aggravated felony resulted in relatively short sentences, or the felony occurred many

---

[14] Section 4A1.2(e)(1) provides that felony convictions are counted if the sentence resulted in imprisonment extending into the 15 years before the offense at issue. Other offenses are counted if the sentence was imposed within 10 years before the offense. U.S.S.G. § 4A1.2(e)(2). Juvenile convictions are counted only if the defendant was incarcerated within five years before the offense. *Id.* § 4A1.2(d)(2).

22-13930          Tᴊᴏꜰʟᴀᴛ, J., Specially Concurring          19

years ago, the Guidelines provide no meaningful enhancement at all.

That is what happened here. Cortero-Roman's prior aggravated felony triggered no enhancement to his base offense level under the revised § 2L1.2.[15] He was charged with illegal reentry following an aggravated felony, but that aggravated felony did not count under Amendment 802 because it occurred too long before sentencing. Indeed, Cortero-Roman only received a four-point enhancement to his base offense level for his previous illegal reentry conviction.[16] In other words, the statutory maximum for Cortero-

---

[15] According to his presentence investigation report, Cortero-Roman was previously convicted of the following felony offenses: "Aggravated Assault with a Deadly Weapon, on or about January 23, 2002, and September 11, 2003, and was removed from the United States on January 15, 2004; September 15, 2005; and October 18, 2011." For the aggravated assault, Cortero-Roman pleaded nolo contendere and was sentenced to two years of community control, a probation sentence. He then pleaded guilty to violating his community control, and his probation was revoked. He was incarcerated for one year and a day. It is possible (if not likely) that the state court imposed a lesser sentence because it knew Cortero-Roman would be deported following his incarceration and therefore there was no need to incarcerate him to protect the public. *See* Fla. Stat. § 921.002(1)(b) (listing the purposes of sentencing in Florida); *see also, e.g.*, Erin A Orrick, Kiersten Compofelice & Alex R. Piquero, *Assessing the Impact of Deportable Status on Sentencing Outcomes in a Sample of State Prisoners*, 39 J. Crime & Just. 28 (2016) (finding "that inmates with federal immigration detainers received significantly shorter sentences compared to non-deportable inmates").

[16] At a Criminal History Category II, and with a two-point acceptance-of-responsibility reduction, the four-point enhancement changed Cortero-Roman's sentence from a Guidelines range of 1–7 months to 8–14 months. If the

Roman's offense increased tenfold, from two to twenty years, but the Guidelines range was identical to as if Cortero-Roman's statutory maximum had remained two years. The Sentencing Commission has thus created a gap—one that allows defendants with aggravated felonies to escape the heightened punishment Congress intended.

The District Court's response to this gap was inadequate. Rather than engaging with the disconnect or considering a departure, the Court jumped to an unexplained variance. Had the Court consulted the Guidelines, it would have recognized that § 5K2.0 allowed it to impose an upward departure. That section seeks to fill gaps like this one, where the base offense level is inadequate to reflect the seriousness of the offense and therefore the need for punishment. *Cf.* 18 U.S.C. § 3553(a) (directing courts to impose sentences that "reflect the seriousness of the offense, ... promote respect for the law, and . . . provide just punishment for the offense").

Because Cortero-Roman's prior aggravated felony—the very conviction that elevated his statutory maximum—had *no* impact on his base offense level, the District Court should have considered an upward departure before it imposed a variance.

## IV. THE PROSECUTOR'S ABDICATION

The error here lies with the District Court, but the prosecution, too, deserves admonishment for neglecting its duty as both a

---

mandatory 16-point enhancement to his base offense level was still in place, Cortero-Roman would have a Guidelines range of 46–57 months.

protector of the public and an officer of the court. All too often the prosecution forgets that its role is to "seek justice, not merely to convict." *See Connick v. Thompson*, 563 U.S. 51, 66–67, 131 S. Ct. 1350, 1362 (2011) (citations and internal quotation marks omitted); Am. Bar Ass'n Ethical Consideration 7-13. This case is a striking example.

At sentencing, the Assistant United States Attorney (AUSA) asked the District Court to impose a sentence within the Guideline range and accepted that the base offense level for Cortero-Roman's illegal reentry was sufficient. But now on appeal, a different AUSA paints Cortero-Roman's offense as atypical. She spends pages detailing Cortero-Roman's "criminal history" that "dat[es] back to when he was a teenager," describing a "lengthy and violent criminal history, which culminated in a brutal attack that began in the presence of [a] nine-year-old child and left the victim bleeding." Indeed, the AUSA concludes that "[t]he [District Court] reasonably determined that Cortero-Roman's case presented circumstances that made a Guidelines sentence inadequate: his lengthy criminal history, his pattern of violence, his numerous disciplinary infractions, and the brutal attack that resulted in his most recent arrest." In other words, the AUSA now argues that Cortero-Roman's offense falls outside the heartland offense contemplated by the Guidelines.

Make no mistake: the District Court bears the duty of imposing a just sentence. But the prosecution has a corresponding duty to advocate candidly for a sentence that fulfills the aims of

justice and protects the public. *See United States v. Malone*, 51 F.4th 1311, 1344 (11th Cir. 2022) (Tjoflat, J., dissenting) ("[T]he government has an affirmative, non-waivable obligation to ensure the district court at sentencing has a correct understanding of all information relevant to imposing a fair and just sentence under the guidelines and the § 3553(a) sentencing factors."). The prosecution failed that duty. By the AUSA's own admission, the prosecution abdicated its responsibility to provide the District Court with an honest recommendation rooted in Cortero-Roman's conduct and the risk he posed.[17] Our justice system—and the public it serves—deserve better.

## V. CONCLUSION

The District Court had the tools it needed to get this sentence right—tools the Sentencing Guidelines provide to ensure fairness, transparency, and consistency. But it chose a variance without first considering a departure. That error matters. A structured departure would have grounded the sentence in the Guidelines, anchored it to the extraordinary facts of Cortero-Roman's case, and left a clear record for review. Instead, the District Court skipped the process, and the prosecutor stood silent. Both fell short of their duties.

---

[17] At oral argument, the AUSA opined that "[she thought] the [government's] fourteen months recommendation was not a reasonable recommendation."